Theodore KING and Aniello Madonna, as Trustees of Local 282 International Brotherhood of Teamsters Welfare, Pension, Annuity and Job Training Trust Funds, Plaintiffs,

v.

JCS ENTERPRISES, INC. and JCS Construction Co., Defendants.

No. CIV.A. 94–4604–WGY.

United States District Court, E.D. New York.

July 13, 2004.

Erinn Weeks Waldner, Michael Bauman, Friedman & Wolf, Bruce S. Levine, Cohen, Weiss and Simon LLP, New York, NY, for Plaintiffs.

Anthony V. Barbiero, Anthony V. Barbiero, P.C., East Islip, NY, for Defendants and Counter Claimant.

Avram H. Schreiber, New York, NY, for Counter Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.[1]

### I. INTRODUCTION

This application for attorneys' fees follows a trial between Plaintiffs Theodore King and Aniello Madonna (collectively "Trustees"), as Trustees of Local 282 International Brotherhood of Teamsters ("Local 282") employee benefit funds against JCS Enterprises, Inc. and JCS Construction Company (collectively "JCS"). Filed under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132, the Trustees sought to collect unpaid contributions to Local 282's employee benefit funds. After a bench trial, this Court held in favor of the Trustees and upon reviewing further evidence, ordered that JCS[2] remit unpaid contributions in the amount of $108,108 plus interest, additional interest, and attorneys' fees and costs as provided by 29 U.S.C. § 1132(g)(2). *King v. JCS Enterprises*, 288 F.Supp.2d 287, 291 (E.D.N.Y.2003).

---

**1.** Of the District of Massachusetts, sitting by designation.

**2.** At trial, the Court ruled that JCS Enterprises, Inc., JCS Construction Company, Andrea Doreen and Conroc were alter egos and thus jointly and severally liable. 5/16/03 Trial Tr. at 556. In addition, the Court ruled that Dorothy Loguidice and Michael Loguidice individually were liable for the obligations of the corporations. *Id.* at 557.

The issue before the Court today is what amount to award the Trustees in attorneys' fees and costs under Section 1132(g)(2).

The Trustees request $363,285.50 in attorneys' fees and $127,921.83 in costs, totaling $491,207.33. Calculating the award based on the lodestar method and following Second Circuit precedent in awarding costs, this Court awards Trustees $297,810.63 in attorneys' fees and $31,211.38 in costs.

## II. BACKGROUND

For the period between July 1, 1993, and June 30, 1996, JCS was a party to a collective bargaining agreement ("CBA") with Local 282. *See* 5/16/03 Trial Tr. at 556; Trial Ex. 2, at 1 (copy of 1993–1996 CBA). In part, this CBA required JCS to make contributions to four employee funds: Welfare, Pension, Annuity and Job Training (collectively "Funds"). CBA § 13. The amount of the contributions was set in the CBA as a specific contribution per fund per hour worked by JCS employees. *Id.* Starting in 1994, the Trustees claimed that JCS skipped payments and under-reported hours to reduce the amount of contributions due. In all, the Trustees filed four separate actions to collect contributions to the Funds from JCS. Those actions involved:

1) a claim for unpaid contributions for March–June 1994 in the amount of $18,288.64, plus liquidated damages and penalties, *King v. JCS Enterprises Inc.*, No. 94–CV–4604 (E.D.N.Y. filed Sept. 30, 1994);

2) a request for an order to compel JCS to post a $20,000 surety bond to guarantee payment to the Funds, as called for in the CBA, *Mastrandrea v. Darcon Construction, Inc.*, No. 95–CV–3663 (E.D.N.Y. filed Sept. 8, 1995);

3) a claim for unpaid contributions for July–August 1995 in the amount of $58,702.52, plus liquidated damaged and penalties, *King v. JCS Enterprises, Inc.*, No. 95–CV–4370 (E.D.N.Y. filed Oct. 25, 1995); and

4) a claim for contributions owed as a result of under-reporting employees hours and general unpaid contributions for February 1994–1996 in the amount of $396,888.88, *LaBarbera v. J.C.S. Enterprises Inc.*, No. 96–2089 (E.D.N.Y. filed Apr. 29, 1996).

These four actions were consolidated for trial before Judge Platt on September 4, 1996, in the lead case of *King v. JCS Enterprises Inc.*, No. 94–4604. Order of 9/04/96 [Doc. No. 42]. At the suggestion of the court, the parties attempted to resolve the matter through an independent audit of JCS' books. *See* Letter from Levine to Judge Platt of 1/7/00 [Doc. No. 117] at 1. JCS disagreed with the auditor's conclusions, however, and pursued the issue in court. Letter from Barbiero to Judge Platt of 1/10/00 [Doc. No. 119] at 1–2.

The matter came before this Court in April 2002. After a bench trial in 2003, the Court concluded that JCS and its alter egos owed contributions to the Funds. 5/16/03 Trial Tr. at 556–58. After receiving further evidence, the Court ordered remittance of the unpaid contributions in the amount of $108,108.00, plus interest, additional interest, and the Trustees' attorneys' fees and costs, as required under 29 U.S.C. § 1132(g)(2). *King*, 288 F.Supp.2d at 291.

## III. DISCUSSION

 Under the "American Rule," prevailing parties will not be awarded attorney's fees unless expressly authorized by Congress. *E.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Congress has expressly provided that attor-

ney's fees and costs shall be awarded to plan trustees who prevail on ERISA claims under 29 U.S.C. § 1145. 29 U.S.C. § 1132(g)(2) ("the court shall award the plan ... reasonable attorney's fees and costs of the action"). As matter of law, such an award under Section 1132(g)(2) is mandatory. *Id.; Iron Workers Dist. Council of Western New York & Vicinity Welfare and Pension Funds v. Hudson Steel Fabricators & Erectors, Inc.*, 68 F.3d 1502, 1506 (2d Cir.1995); *King*, 288 F.Supp.2d at 288.

### (a) Attorney's Fees

█ The amount of attorney's fees awarded under ERISA must be "reasonable." 29 U.S.C. § 1132(g)(2). In determining what is a reasonable fee, the Second Circuit "generally follow[s] the framework set forth by the Supreme Court" in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004); *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir.1999). The first step is to calculate the "lodestar"[3] amount—that is, "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933.

### 1. Hours Reasonably Expended

█ The lodestar calculation should include only hours that were reasonably expended on the litigation. *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933; *Orchano v. Advanced Recovery Inc.*, 107 F.3d 94, 98 (2d Cir.1997). The prevailing party has the burden of producing contemporaneous time records that "specify, for each attorney, the date, the hours expended, and the nature of the work done," so the court can audit the hours and determine whether they were reasonably expended. *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir.1983); *see also Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. In addition to hours worked by attorneys, the hours reasonably expended by law clerks will be included in the calculation. *New Leadership Comm. v. Davidson*, 23 F.Supp.2d 301, 305 (E.D.N.Y.1998) (Gershon, J.) (holding that law student fees recoverable); *cf. Missouri v. Jenkins*, 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (holding that paralegals' time should be included in the lodestar calculation); *United States Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir.1989) (affirming award of fees that included paralegals' time in lodestar calculation).

The Trustees have submitted detailed billing records for the 1786 .75 hours they attribute to this case. *See generally* Bauman Decl. of 10/17/03 ("Bauman Decl.").[4] Although JCS contends that "many of the records are inadequate to support a fee award," Defs.' Mem. Opp'n to Pls.' App. Attys' Fees at 28, the Court disagrees. The records detail the time expended on this case, identifying who did the work, what was done, and when. *See generally* Bauman Decl. These records sufficiently describe the work performed by the Trus-

---

**3.** Although the moniker "lodestar" is not used in *Hensley*, the initial calculation described in that case has become known as the lodestar calculation. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563–64, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

**4.** Bauman alleges that his firm, Friedman & Wolf, spent a total of 1,723.5 hours on this

litigation. *See* Bauman Decl. ¶ 6. The billing records show that the declaration understates William K. Wolf's hours by four (16 as opposed to 20 hours), so the Court treats the request as one for 1727.5 hours. *See id.; id.* Ex. A3. The 59.25 hours that Bauman attributes to the law office of Avram H. Schreiber accurately reflects the billing records. *See id.* ¶ 8; *id.* Ex. B. The total is thus 1786.75 hours.

tees' attorneys and rule out any reduction to the requested hours on the basis of inadequate documentation.

From these records, the Court must determine what hours were reasonably expended and will therefore be included in the lodestar calculation. Excessive and unnecessary hours as well as time spent on unsuccessful claims should be excluded from the lodestar calculation. *See Hensley,* 461 U.S. at 434, 436–37, 103 S.Ct. 1933; *Orchano,* 107 F.3d at 98.[5] If an unsuccessful claim is distinct and severable, the time attributable to that claim simply ought be omitted from the amount of hours reasonably expended on the suit. *See Hensley,* 461 U.S. at 434–35, 103 S.Ct. 1933. Where it is impractical to separate out the hours, for example because the successful and unsuccessful claims are interwoven by a common core of facts so that much of the time was spent in developing the case as a whole, the hours are included *in toto* in the lodestar calculation. *See id.* at 435, 103 S.Ct. 1933. In such a case, the court may exercise its discretion to reduce the total lodestar amount to account for the lack of complete success. *See id.* at 436–37, 103 S.Ct. 1933; *see also United States Football League,* 887 F.2d at 414.

To support their request for 1786.75 hours, the Trustees begin by noting that "it is undisputed that the case has had a long, contentious history, and has been defended ferociously." Pls.' Mem. Supp. of Mot. Attys' Fees at 5. The Trustees argue that they should be awarded their full fee request because they achieved nearly complete success. Pls.' Reply Mem. Supp. of Mot. Attys' Fees at 10.

Acknowledging that they did not prevail on every theory advanced, the Trustees suggest that any " 'failure' on certain claims[ ] should have no bearing on the attorney's fee award" because they were not primary theories, and further because they shared facts common to other primary—and successful—theories. *See id.* at 13–14.

JCS disputes the Trustees' characterization of the case as successful, claiming rather that "[t]he [Trustees] [d]id [n]ot [p]revail on the [p]rincipal [i]ssues in this [c]ase." Defs.' Mem. Opp'n to Pls.' App. Attys' Fees at 18. Specifically, JCS points out that the Trustees recovered less than twenty percent of the amount originally claimed as damages. *Id.* at 20. In addition, JCS argues that the Trustees should not recover attorneys' fees for "meritless" theories, such as the individual fraud claims against Dorothy and Michael Loguidice (collectively "Loguidices"), and their "penalty audit theory." *See id.* at 14. JCS thus urges the Court to eliminate or reduce part of the Trustees' fee application because the Trustees were not entirely successful. *See id.* at 20–22. JCS thus assumes the burden of establishing that any reductions are justified. *United States Football League,* 887 F.2d at 413.

The Court considers these arguments as it reviews the Trustees' degree of success in this case. The Trustees initially sought unpaid contributions to the Funds from 1994 through 1996 of approximately $396,000.00. Pls.' Reply Mem. Supp. of Mot. Attys' Fees at 15. At trial, the Trustees succeeded in proving that JCS owed contributions from 1994 to 1996, but the Court held that the unpaid contributions totaled only $108,108.00, slightly more than

---

5. Fee-shifting statutes typically are not designed to award attorney's fees "whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill." *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933. The very fact that the relevant statute here refers to "a judgment in favor of the plan" as a precondition for being awarded attorney's fees suggests that the award should only be given for successful claims. *See* 29 U.S.C. § 1132(g)(2).

twenty-seven percent of what was originally requested by Trustees. *See King,* 288 F.Supp.2d at 291 App. A. Looking at the results of the case, *see Hensley,* 461 U.S. at 435, 103 S.Ct. 1933, the Trustees collected all the unpaid contributions, which was the thrust of the litigation. That the amount of the unpaid contributions was less than originally sought does not diminish the level of the Trustees' success.[6]

The Court next looks at the effect on attorneys' fees for collateral matters or alternate legal theories that were unsuccessful. The Supreme Court in *Hensley* discussed the effect on attorney's fees where parties are not completely successful: "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." 461 U.S. at 435, 103 S.Ct. 1933. This rule depends on the alternate legal theories sharing a common core of facts with the theories that were ultimately successful. *See id.; United States Football League,* 887 F.2d at 414. In this way, the work even on an unsuccessful alternate theory is related to the development of the case as a whole. *See Hensley,* 461 U.S. at 435, 103 S.Ct. 1933. The Court notes that the legal theories JCS condemns as unsuccessful were alternative theories of recovery to those on which the Trustees prevailed. The Loguidices were held individually liable for the debts of the corporations they controlled (the JCS corporations, Andrea Doreen, and Conroc), 5/16/03 Trial. Tr. at 556–57, the same result as would have obtained had the Court held that they had individually defrauded Local 282. Moreover, although the Trustees did not recover under "penalty" provisions in the CBA,

they did collect the actual unpaid contributions to the Funds. *See King,* 288 F.Supp.2d at 291. Therefore, the time spent pursuing the Trustees' alternate theories of recovery is fully recoverable in the attorneys' fee award. *See United States Football League,* 887 F.2d at 414.

Having found no reason to reduce the requested attorneys' fees based on alleged lack of success, the Court reviews the Trustees' attorneys' time records to validate the reasonableness of the expenditures claimed. *See New Leadership Committee,* 23 F.Supp.2d at 310 (reviewing type of work performed to determine whether requested hours reasonable). The attorneys spent their time meeting with clients, interviewing witnesses, taking and reviewing depositions, communicating with opposing counsel, analyzing the independent audit report, preparing a calculation of damages, drafting motions, and appearing in court. Bauman Decl. Ex. A1–A24. These tasks are squarely in line with what would be reasonably necessary to litigate this or any other case. The Court does make one adjustment to the total requested hours, however. The Court identifies several attorneys and clerks as billing for fewer than four total hours. Bauman Decl. Ex. A6, A9, A10, A14, A15, A17, A23 (billing 1.25 hours for James R. Grisi, .25 hours for Jennifer Weekley, .75 hours for Eric Foy, 2.5 hours for Elizabeth O'Leary as an associate, 1 hour for Elizabeth O'Leary as a clerk, 3 hours for Robert Satran, 3.5 hours for Michael Hession, and .25 hours for Robert Buckley, for a total of 12.5 hours). Compared with the total amount of hours expended, "it is unlikely that [they] could have made a meaningful contribution to the case in such a

---

**6.** The Court need not address the Trustees' argument that their overestimation of the unpaid contributions was due to the unavailability of reliable records, which was in turn due

to JCS's inequitable conduct. What matters is that the Trustees sued to recover unpaid contributions, and that they were entirely successful in doing so.

brief period of time," and the Court omits those hours. *Rodriguez v. McLoughlin,* 84 F.Supp.2d 417, 424 (S.D.N.Y.1999) (Wood, J.) (excluding total billings of one hour or less); *see Shannon v. Fireman's Fund Ins. Co.,* 156 F.Supp.2d 279, 299 n. 19 (S.D.N.Y.2001) (Scheindlin, J.) (omitting seven hours spent by five individuals collectively as "nominal").

Based on a review of Trustees' attorneys' billing records and the case, this Court finds that the lodestar calculation will be based on 1774.25 hours [7] reasonably expended.

### 2. Hourly Rate

■ A reasonable hourly rate is one that is consistent with the "prevailing market rates in the relevant community," that is, what similarly skilled attorneys in the area would charge for similar work.[8] *Blum v. Stenson,* 465 U.S. 886, 895 & n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *see Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d 1053, 1058–59 (2d Cir.1989), *cert. denied,* 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990); *Cohen v. West Haven Board of Police Comm'rs,* 638 F.2d 496, 506 (2d Cir.1980). The fee applicant shoulders the burden of establishing that the prevailing market rate and that the requested hourly rates are similar. *Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. 1541. Those who submit a schedule of their regular billing rates have done half the work of setting a reasonable hourly rate to use in the lodestar calculation. *See id.; New Leadership Committee,* 23 F.Supp.2d

at 304. The other essential part is that the applicant establish the rates that attorneys in the community regularly charge for similar work. *See Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. 1541; *New Leadership Committee,* 23 F.Supp.2d at 304. Only after producing both pieces can applicants demonstrate to the court that their requested rates are within prevailing market rates.

■ As evidence that the Trustees' attorneys' rates comport with the prevailing market rates, the Trustees cite two Eastern District of New York ERISA cases involving the Trustees' attorneys. Pls.' Mem. Supp. of Mot. Attys' Fees at 4. The plaintiffs in *Brown v. Greco Family Concrete Co.,* No. 95–CV–2105 (E.D.N.Y. July 31, 2002) (Real, J.), represented by Friedman & Wolf, prevailed on their ERISA claim. *Id.* at 8–9; *see* Pls.' Mem. Supp. of Mot. Attys' Fees Ex. A (copy of July 31, 2002 judgment in *Brown* ). In performing the lodestar calculation, the court recognized that the regular hourly rates charged by the attorneys were in line with prevailing market rates in the New York City area. *Id.* at 3–4, 7 (allowing hourly rates of $140 for first year associate, $295 for experienced senior partner, and $70–85 for law clerks). In *Jaffe v. International Brotherhood of Teamsters Local 282,* No. 97–CV–0934 (E.D.N.Y. Feb 1, 2002) (Mann, M.J.), Friedman & Wolf represented the defendants and successfully opposed an ERISA claim. *Id.* at 1, *modified in part on other grounds,* 2003 WL 22697729 (E.D.N.Y. Nov.10, 2003) (John-

---

7. See attached Appendix A.

8. This rate will not necessarily equal what the attorney could have received under an agreement with the client. *Delaware Valley,* 478 U.S. at 565, 106 S.Ct. 3088. A fee-shifting statute is only designed to provide a "reasonable fee." *Id.* In this way, plaintiffs are able to attract counsel to handle claims where there are insufficient awards to cover costly

legal fees or where the parties are simply unable to afford the fees. *Iron Workers,* 68 F.3d at 1506 (noting the role of Section 1132(g)(2) in ensuring that employee benefit plans can efficaciously recover unpaid contributions); *see Delaware Valley,* 478 U.S. at 565, 106 S.Ct. 3088 (implying that, without fee shifting, private parties seeking to enforce the Clean Air Act might not have sufficient resources to hire attorneys).

son, J.); *see* Pls.' Mem. Supp. of Mot. Attys' Fees Ex. A (copy of February 1, 2002 Report and Recommendation in *Jaffe*). The court used Friedman & Wolf's regular rates as reasonable rates in the lodestar calculation. *Jaffe*, No. 97–CV–0934, at 9–10 (ranging from $140 for first year associate to $295 for experienced senior partner and $75–$85 for law clerks).

This Court follows its colleagues sitting in the Eastern District of New York, and rules that *Brown* and *Jaffe* establish that the Trustees' attorneys' rates identified therein are in line with prevailing market rates. Regarding later increases in the attorneys' hourly rates, the Trustees have not produced any evidence that these newest rates reflect the new prevailing market rate. Therefore, the Court notes that only those rates identified in *Brown* and *Jaffe* are reasonable hourly rates to be included here. The following are Friedman & Wolf rates for the lodestar calculation:

$265 for Eugene S. Friedman's time prior to June 1, 1997, and $295 thereafter (*see Brown*, No. 95–CV–2105, at 3);

$230 for Bruce S. Levine's time prior to June 1, 1997, $260 prior to February 29, 2000, and $285 thereafter (*see id.*);

$230 for William K. Wolf's time prior to January 1, 1997, $260 prior to February 29, 2000, and $285 thereafter (*see id.*);

$155 for Mary M. Dickman's time prior to January 1, 1997, and $215 thereafter (*see id.;* Bauman Decl. ¶ 5);

$215 for Michael Bauman's time prior to February 29, 2000, and $235 thereafter (*see Brown*, No. 95–CV–2105, at 3);

$175 for William Anspach's time (*see id.;* Bauman Decl. ¶ 5);

$140 for Erinn W. Waldner, Nathan V. Bishop, and Teague P. Paterson's time (*see Brown*, No. 95–CV–2105, at 3; Bauman Decl. ¶ 5);

$75 for Cary Nadelman, Margaret Drohan, Nicole Feder, and Candice F. Frost's time (*see Brown*, No. 95–CV–2105, at 4);

$72.50 for Elissa Podolsky's time (*see infra*); and

$70 for Dawn Zuroff and Walter Bubble's time (*see Brown*, No. 95–CV–2105, at 4).

For Friedman & Wolf attorneys and clerks not specifically listed in *Brown* or *Jaffe*, their rates were determined by a comparison to others whose rates were deemed reasonable in those cases. Erinn W. Waldner, Nathan V. Bishop, and Teague P. Paterson all had similar professional experiences (date of law school graduation and years practicing labor and employee benefits law) to Elizabeth O'Leary, so the rates allowed for Elizabeth O'Leary in *Brown* shall apply to Erinn W. Waldner, Nathan V. Bishop, and Teague P. Paterson here. Walter Bubble was a law clerk at school with Dawn Zuroff and is awarded the same reasonable hourly rate. For Elissa Podolsky, no evidence was offered to support the requested $95 hourly rate; her hourly rate here is set at $72.50, in the middle of the range of prevailing market rates for other law clerks in the firm.

The Trustees' application for attorneys' fees also includes hours worked by the Law Offices of Avram H. Schreiber. Bauman Decl. Ex. B. These attorneys handled the Trustees' claims from June 29, 1994, to August 11, 1997. *Id.* As identified in the time records, the requested hourly rates are:

$200 for Avram H. Schreiber's time;

$125 for M.R.K. and G.R.S.'s time; [9] and

$50 for D.D.'s time.[10]

---

**9.** The Trustees have not identified billing attorneys from the Law Offices of Avram H. Schreiber beyond the initials in the billing records. *See* Bauman Decl. Ex. B.

**10.** The Trustees produced only minimal evidence supporting the reasonableness of the requested rates for the Law Offices of Avram Schreiber. While the Trustees supplied time

Consulting cases [11] approximately contemporaneous with their service, the Court deems the following rates to have been prevailing in the Eastern District of New York in the early to mid–1990s: $200 and up for partners (the higher end of the scale reserved for highly experienced partners in the relevant field); $125–$155 for associates; and $65–$75 for law clerks. *Brown*, No. 95–CV–2105, at 3–4, 7; *New Leadership Committee*, 23 F.Supp.2d at 310; *DeVito v. Hempstead China Shop, Inc.*, 831 F.Supp. 1037, 1044 (E.D.N.Y. 1993) (Spatt, J.). The requested rates for the Law Offices of Avram Schreiber are in line with or below the prevailing market rates, and thus are reasonable rates for use in the lodestar calculation.

Having determined that 1774.25 hours were reasonably expended and the reasonable market rates above, the Trustees shall be awarded $297,810.63 in attorneys' fees.

**(b) Costs**

■ Section 1132(g)(2)(D) provides that a court shall award "costs of the action" as well as attorney's fees. Costs are defined by 28 U.S.C. § 1920, and include filing and subpoena fees, as well as costs of transcripts, printing, making copies, and disbursements for witnesses. 28 U.S.C. § 1920. Courts in the Second Circuit will also generally award as costs "those rea-

sonable out-of-pocket expenses incurred by the attorney and which are normally charged fee paying clients." *DeVito*, 831 F.Supp. at 1045 (quoting *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 283 (2d Cir.1987)) (internal quotation marks omitted). This excludes amounts that constitute an attorney's overhead, since those are not typically charged to a client. *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998). Examples of expenses that are not considered overhead and may be recovered as costs are: telephone, postage, and travel. *Id.* (cataloguing expenses properly treated as recoverable costs under fee-shifting statutes). Thus, those costs that fall within the categories above shall be awarded to the Trustees. The Court specifically reviews those expenses not described above.

**1. Lexis and Westlaw Fees**

■ A number of Second Circuit cases have cited *United States ex rel. Evergreen Pipeline Construction Co., Inc. v. Merritt Meridian Construction Corp.*, 95 F.3d 153 (2d Cir.1996), to support their position on the recovery of online research fees as part of a fee award under a fee-shifting statute. *Compare Anderson v. City of New York*, 132 F.Supp.2d 239, 247 (S.D.N.Y.2001) (Stein, J.) (allowing online research costs as part of attorney's fee award), *Gonzalez v. Bratton*, 147

---

records for those attorneys, they did not give any description of the attorneys' professional experience or offer any evidence to show their requested rates were in line with rates similar attorneys were charging. *See* Bauman Decl. Ex. B. It is understandable that the Trustees may not have readily been able to provide this information because the Law Offices of Avram Schreiber had not been associated with this case for over five years and a different firm assisted in preparing this fee application. In light of this, this Court will make all reasonable inferences from the available information. For the purposes of determining a reasonable fee, the Court will observe that

Avram Schreiber is a partner, and assume that M.R.K. and G.R.S. are associates and that D.D. is a law clerk.

11. Owing to a lack of evidence offered by the Trustees, the Court exercises its discretion to consider other evidence of the prevailing market rates. *Cf. Chambless*, 885 F.2d at 1059 (upholding district judge's reliance on his own knowledge of market rates); *Miele v. N.Y. State Teamsters Conference Pension & Ret. Fund*, 831 F.2d 407, 409 (2d Cir.1987) (noting that a district judge may "rely in part on the judge's own knowledge of private firm hourly rates in the community").

F.Supp.2d 180, 212 (S.D.N.Y.2001) (Marrero, J.) (same), *and Jaffe*, No. 97–CV–0934 at 10–11 (allowing online research fees as costs), *with Fink v. City of New York*, 154 F.Supp.2d 403, 415 (E.D.N.Y.2001) (Trager, J.) (disallowing online research fees because such fees merely substitute for attorney's time), *BD v. DeBuono*, 177 F.Supp.2d 201, 209 (S.D.N.Y.2001) (McMahon, J.) (disallowing online research fees as costs because they are regular overhead), *and L.I. Head Start Child Dev. Servs., Inc. v. Kearse*, 96 F.Supp.2d 209, 215–16 (E.D.N.Y.2000) (Spatt, J.) (disallowing online research fees after finding such online fees substitute for attorney's time). Since *Evergreen* remains good law in the Second Circuit and is binding on this Court, what does it actually require?

It appears that the judges in the Eastern District uniformly disallow applications for electronic research costs. This Court is generally of the view that "[i]f the precedent is from a sitting judge in one's own court and represents [his] mature reflection, the argument in favor of following it rests not only on the appropriate amenities, but also on profounder considerations of equality in the treatment of litigants." Wyzanski, "The Essential Qualities of a Judge," from *The New Meaning of Justice* (1956), *reprinted in Handbook for Judges* 96 (American Judicature Society 1975). Moreover, the Eastern District judges' approach seems to be the better reasoned one. Private market attorney fee rates reflect overhead costs like electronic research, just as they would reflect the cost of case reporters and other necessary books purchased for a law firm's library. Moreover, the availability of electronic research allows attorneys to accomplish tasks more quickly, making their time more valuable. When the *Evergreen* court

"agree[d] that computer research is merely a substitute for an attorney's time that is compensable under an application for attorney's fees and is *not a separately taxable cost*," 95 F.3d at 173 (emphasis added), it meant not that electronic research costs could be recovered if included in the attorney's fee application, but rather that they were already reflected in the lodestar calculation. Therefore, the Court declines to award the Trustees the $3348.24 they seek in electronic research costs.[12]

### 2. Rand Consulting Fees

■ The Trustees have applied for the recovery of Rand Consulting fees and have cited several district court cases allowing auditors' fees to be recovered as costs. Pls.' Reply Mem. Supp. of Mot. for Attys' Fees at 15–16. These courts have based their decisions on the availability of "other ... equitable relief" in ERISA fee awards under 29 U.S.C. § 1132(g)(2)(E). *See e.g., Maguire v. America Piles, Inc.*, 2002 WL 31626972, No. 01 Civ. 9483(DLC) at *2 (S.D.N.Y. Nov. 21, 2002) (Cote, J.) (adopting Report and Recommendation of Katz, M.J.). Sometimes, the courts cite as an additional ground for such recovery provisions in the relevant collective bargaining agreements that specifically require shifting such costs. *See, e.g., id.; Mason Tenders District Council Welfare Fund v. Envirowaste and Transcontractors, Inc.*, No. 98 Civ. 4040(DC), 1999 WL 370667, at *2 (S.D.N.Y. June 7, 1999). This is consistent with 29 U.S.C. 1132(g)(2)(E), which permits "other legal ... relief." In some cases, the collective bargaining agreement provides the sole justification for awarding auditors' fees. *See Trustees of the Four Joint Bds., Health & Welfare Pension*

---

**12.** The First Circuit takes a contrary approach, at least when a firm ordinarily charges its clients for research as a separate disbursement. *See Invessys, Inc. v. McGraw–Hill Cos., Ltd.*, 369 F.3d 16, 22–23 (1st Cir. 2004).

*Funds v. Penn Plastics, Inc.,* 864 F.Supp. 342, 350–51 (S.D.N.Y.1994).

The Trust Agreement between Local 282 and JCS, which is incorporated into the CBA, *see* CBA § 13(G), expressly provides for recovery of auditors' fees. Trial Ex. 4, Art. VI, § 3(C) (copy of the Trust Agreement) [hereinafter "Trust Agreement"]. It states, in pertinent part:

(c) Auditor's fees—$150 for each day expended in auditing the Employer in all cases in which:

(1) it is determined by such audit that the amount of the Employer's delinquent contributions to the Funds for the period covered by the audit exceeds $1,000 in the aggregate, or

(2) collection of the Employer's delinquent contributions reported by the audit is referred to the Funds' attorney, irrespective of whether such collection involves Suit or other Court Proceedings.

The Statement of a Certified Public Accountant making the audit as to time expended shall be binding on the Employer for the purposes of any legal proceedings.

*Id.*

The bills that the Trustees have provided for the Rand Consulting audit do not describe the nature of the work done, only the hours expended and the amount charged. *See* Bauman Decl. Ex. A25, at 15–20. This is particularly troubling because the bills add up to $84,572.66.

The Court must first determine to what the Trustees are entitled under the Trust Agreement. The provision quoted above does not shift the entire cost of an audit to JCS. Rather, it shifts $150 a day, although JCS is bound to accept the time that a Certified Public Accountant making the audit claims to have spent.[13] The bills provided do not show days, however; they only show hours worked by various individuals. *See id.* As JCS is bound by the hours alleged, the Court draws reasonable inferences therefrom as to how many days were spent.

The bills charge as follows: $19,223 through June 15, 2003; $12,919 for June 16–22, 2003; $20,029 for June 23–29, 2003; $2,643 for June 30 through July 6, 2003; $18,241.66 for July 7–14, 2003; and $11,517 for July 15 through August 14, 2003. In each of the first three weeks billed, at least one employee worked between thirty and fifty hours. The Court therefore infers that the Rand Consulting Group, Inc. spent five days in each of those weeks working on the audit. Between June 30 and July 6, 2003, two employees spent a total of 10.2 hours between them, so the Court infers that one day was worked. The bill for the week of July 7 through July 14, 2003, resembles those for the first three weeks, so the Court attributes five days for that week. On the last bill, the most any employee reports is 34.9 hours, so the Court imputes five days for that period. The Trust Agreement therefore entitles the Trustees to $3,900 for the 26 days of work performed.

The next question is whether the Court should award some larger amount, up to the amount alleged in the submitted invoices, as "other equitable relief." The Court holds that further shifting of the costs of the audit would be inappropriate, because the invoices do not adequately specify what work was performed. It would be inequitable to allow the costs of this audit, particularly given the size of the

---

**13.** This is even clearer when the provision is read in context. Section 3 of the Trust Agreement includes highly specific provisions for attorney's fees in collections before suit, attorney's fees involving suit, auditor's fees, and liquidated damages. *See* Trust Agreement Art. VI, § 3.

expense, when the Trustees have failed to meet the specificity standards that generally apply to attorney's fees and costs.

The Court therefore allows $3,900 for the audit.

### 3. Witness Fees

 Witness fees are recoverable only so far as is allowed in 28 U.S.C. § 1821(b), "absent contract or explicit statutory authority to the contrary." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987); *see* 28 U.S.C. § 1821(a). Section 1821(b) limits witness fees to $40 a day for each day of attendance, and such fees generally will not be awarded unless the witness actually testifies in court. 28 U.S.C. § 1821(b); *Evergreen*, 95 F.3d at 173. The Trustees' detail of costs lists five entries for "witness fees," totaling $873. Bauman Decl. Ex. A25. The entries do not list the names of the witnesses and do not correspond with any court dates, making their propriety unlikely. Since the evidence does not show that the costs are related to witnesses who actually testified in court, the Court disallows these costs.

### 4. Temporary Help

 The Trustees have listed temporary help expenses as part of their costs. Bauman Decl. Ex. A25 (listing "Choice temps" and data entry clerk costs). These fees are not properly recoverable as costs. *See Jenkins*, 491 U.S. at 285, 109 S.Ct. 2463 (describing such fees as an element of the attorney's fee). A data entry clerk or other general temporary worker would be similar to a secretary "whose labor contributes to the work product for which an attorney bills her client" and is part of the attorney's fee. *Id.* Thus, the $5,764 alleged in this category ($2,316 for "choice temps" and $3,448 for "data entry clerk") are not properly recoverable.

### 5. Miscellaneous Costs

 The Trustees bear the burden of establishing, by sufficient evidence, the propriety of the requested costs, the same burden imposed on the Trustees for establishing reasonable attorneys' fees. *Cf. Carey*, 711 F.2d at 1148 (requiring detailed records for attorney's time). In the first instance, the Trustees fail to meet this burden for the $1,310 in costs described as "H Parker." Bauman Decl. Ex. A25. No other description of these costs is provided and it is unclear what they represent, so the Court disallows them.

Additionally, the Trustees charge $4,687.99 in miscellaneous charges related to the "JCS delinquency trial" for May 11 to May 16, 2003, "including hotel, ground transportation, meals, telephone calls, car rental, parking, [and] internet charges." *Id.* at 11. It is highly unlikely that these costs, if actually incurred, were at all necessary. The JCS trial was held in New York City, where JCS's attorneys work, so there was no reason to stay in a hotel. Had JCS attorneys used their own cars, parking might be a reasonable expense, but the combination of car rental and parking is extravagant; New York City has a more than adequate public transportation system and taxi cab fleet. JCS's attorneys could not have billed a private client for meals, as attorneys eat whether they are on the job or not. As the Trustees have not sufficiently justified these larger costs, the Court declines to award them. As for the remaining telephone, internet, and ground transportation costs, the Court has no way of ascertaining their amount, and they are apt to be negligible compared to the overall amounts at stake in this case, so the Court declines to award them as well.

### (c) Interest on Attorneys' Fees

 As *Albahary v. City and Town of Bristol, Connecticut*, 96 F.Supp.2d 121

(D.Conn.2000) (Arterton, J.), states, "it is an open question in the Second Circuit whether interest runs from the date of the judgment establishing the right to the award of attorneys fees or from the date of the judgment establishing its quantum." 96 F.Supp.2d at 122. Not prior to or since *Albahary* was decided has the Second Circuit Court of Appeals taken up this issue. Across the country, the majority rule, followed in the Fifth, Sixth, Eighth, Ninth, Eleventh, and Federal Circuits, is that interest accrues "from the date the party becomes entitled to the award even if that award is not quantified until a later point." *See id.* at 123 (collecting cases from the Fifth, Eighth, and Federal Circuits); Nick J. Kemphaus & Richard A. Bales, *Interest Accrual on Attorney's Fee Awards*, 23 Rev. Litig. 115, 116–17 & n. 13 (2004) (discussing in detail the circuit split on interest awarded for attorney's fees awards, and collecting cases). The majority position is based on the realization that, "[w]hile the fee-paying party is under no legal compulsion to satisfy its obligation before quantification, it also 'suffers no prejudice from any delay in quantifying the award because it has use of the money in the interim and because the statutory interest rate is tied to the U.S. Treasury Bill rate.'" *Albahary*, 96 F.Supp.2d at 123 (quoting *Jenkins v. Missouri*, 931 F.2d 1273, 1277 (8th Cir.1991)). The minority rule, followed in the Third, Seventh and Tenth Circuits, states that interest accrues from the date it is quantified. *Id.;* Kemphaus & Bales, *supra,* at 116–17 & n. 13 (collecting cases).

Noting that *Albahary* aligns itself with the majority rule, the Court here does so as well. The Court therefore awards the Trustees post-judgment interest on the award of attorneys' fees and costs at the U.S. Treasury Bill rate, *see* 28 U.S.C. § 1961(a), from the date the Trustees became entitled to receive attorneys' fees and costs under ERISA. That date is determined to be May 16, 2003, the date this Court announced in its findings of fact that Trustees had succeeded in establishing that JCS violated ERISA. 5/16/03 Trial Tr. at 558. Although the Court did not mention the Trustees' right to attorneys' fees then, the fact that the Court announced a violation of 29 U.S.C. § 1145 unconditionally entitled the Trustees to that award. *See* 29 U.S.C. § 1132(g)(2); *Copper Liquor, Inc. v. Adolph Coors Co.,* 701 F.2d 542, 545 (5th Cir.1983) (en banc), *overruled in part on other grounds by Int'l Woodworkers of America v. Champion Int'l Corp.,* 790 F.2d 1174, 1175 (5th Cir.1986) (en banc) (holding that if a judgment fails to mention fees but a party is unconditionally entitled to them by statute, interest accrues from the date of the judgment).

## IV. CONCLUSION

Accordingly, the Trustees' Application for Attorneys' Fees and Costs is ALLOWED as modified by the Court. Under 29 U.S.C. § 1132(g)(2)(D), the Trustees are awarded attorneys' fees in the amount of $297,810.63 and costs of $31,211.38.[14] The total award is subject to interest, accrued in accordance with 28 U.S.C. § 1961,[15] at a rate of 1.23% from May 16, 2003, until the award is paid in full.

---

**14.** The amount the Trustees ask for in costs is actually $.04 less than what is listed in the costs invoices; the Court relies on the latter. *See* Bauman Decl. ¶¶ 8–9 (alleging $127,121.26 in costs, plus the $20 statutory fee and $780.57 in costs for the law office of Avram H. Schreiber); *id.* Ex. A25 (detailing costs adding up to $127,121.30).

**15.** *See* Federal Reserve Statistical Release, http://www.federalreserve.gov/releases/h15/current/ (last visited May 25, 2004)

SO ORDERED.

### Appendix A

| Attorney/Clerk | Time Period | Hours | Rate | Total |
|---|---|---|---|---|
| Friedman | 5/15/95–2/03/97 | 6 | $265.00 | $ 1,590.00 |
| | 7/29/97–7/8/03 | 10 | $295.00 | $ 2,950.00 |
| Levine | 6/27/95–3/31/97 | 14 | $230.00 | $ 3,220.00 |
| | 7/9/97–12/29/99 | 95.25 | $260.00 | $ 24,765.00 |
| | 4/27/00 | .25 | $285.00 | $ 71.25 |
| Wolf | 3/12/96–3/20/96 | .75 | $230.00 | $ 172.50 |
| | 7/30/97–12/16/99 | 7.75 | $260.00 | $ 2,015.00 |
| | 4/26/00–7/10/03 | 11.5 | $285.00 | $ 3,277.50 |
| Dickman | 8/10/95–12/20/96 | 103.75 | $155.00 | $ 16,081.25 |
| | 1/21/97–6/22/00 | 426 | $215.00 | $ 91,590.00 |
| Bauman | 6/16/98–2/9/99 | 1 | $215.00 | $ 215.00 |
| | 1/18/02–8/13/03 | 306.5 | $235.00 | $ 72,027.50 |
| Anspach | 7/9/97–1/20/98 | 6.75 | $175.00 | $ 1,181.25 |
| Waldner | 4/4/03–8/19/03 | 219.25 | $140.00 | $ 30,695.00 |
| Bishop | 5/8/03–5/14/03 | 24.5 | $140.00 | $ 3,430.00 |
| Patterson | 4/21/03–5/8/03 | 11 | $140.00 | $ 1,540.00 |
| Schreiber | 6/29/94–12/7/95 | 16.89 | $200.00 | $ 3,378.00 |
| M.R.K. | 6/30/94–8/29/96 | 20.46 | $125.00 | $ 2,557.50 |
| G.R.S. | 7/20/94–8/11/97 | 17.01 | $125.00 | $ 2,126.25 |
| Zuroff | 5/28/96–7/29/96 | 28.75 | $ 70.00 | $ 2,012.50 |
| Nadelman | 10/5/97–2/6/98 | 149 | $ 75.00 | $ 11,175.00 |
| Drohan | 8/29/97–2/4/98 | 150.75 | $ 75.00 | $ 11,306.25 |
| Feder | 6/2/97–6/17/97 | 9 | $ 75.00 | $ 675.00 |
| Bubble | 5/27/98–8/10/98 | 92.25 | $ 70.00 | $ 6,457.50 |
| Frost | 3/5/99–4/23/99 | 33.75 | $ 75.00 | $ 2,531.25 |
| Podolsky | 7/30/03–7/31/03 | 7.25 | $ 72.50 | $ 525.63 |
| D.D. | 9/29/94–11/6/95 | 4.89 [16] | $ 50.00 | $ 244.50 |
| **Total** | | 1774.25 | | $297,810.63 |

---

16. Two entries are not attributed to any attorney, so the Court attributes them to the lowest paid clerk the firm had working on the case. *See* Bauman Decl. Ex. B, at 14.