In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-3960 & 07-3983

TRUSTEES OF THE CHICAGO
PLASTERING INSTITUTE
PENSION TRUST, *et al.*,

*Plaintiffs-Appellees*,
*Cross-Appellants*,

*v.*

CORK PLASTERING COMPANY,
f/k/a G and J PLASTERING
COMPANY, INC.,

*Defendant-Appellant*,
*Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 6867—**Sidney I. Schenkier**, *Magistrate Judge.*

ARGUED DECEMBER 1, 2008—DECIDED JULY 1, 2009

Before BAUER, ROVNER, and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Beginning in 1984, G and J
Plastering Company ("G&J") operated as a plastering
contractor in Cook County, Illinois, and surrounding

counties.[1] Its employees were represented by multiple unions, among them the Journeymen Plasterers' Protective and Benevolent Society of Chicago, Local 5 ("Local 5"), until a November 2002 election, when the employees selected a union other than Local 5 as their one and only bargaining representative. As a consequence of that election, G&J "exited" from the collective bargaining agreement with Local 5 and ceased making contributions to the various fringe benefit trust funds serving Local 5 members (the "Local 5 Funds"). When the Local 5 Funds conducted an exit audit of G&J's records to determine whether G&J had any outstanding liability to the Funds, they determined that G&J had not made the appropriate contributions to the Local 5 Funds for work performed within Local 5's jurisdiction. They filed suit against G&J pursuant to section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, and section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(3). After a three-day trial, the district court found that G&J had not complied with its obligations to the Local 5 Funds[2] and entered

---

[1]  G&J sold its assets in 2006 to Elite Plastering Co., Inc., which assumed G&J's name. G&J in turn changed its name to Cork Plastering Company. Cork is the defendant in this suit. However, because the defendant operated under the name of G&J throughout the time period relevant to this litigation, that is the name that we shall use.

[2]  As discussed in greater detail below, Local 5 itself is a plaintiff based on the fact that G&J was obliged to collect and forward working assessments (i.e., union dues) to Local 5 for work

(continued...)

judgment in the Funds' favor in the total amount of $1,109, 466.23. The court later awarded the plaintiffs costs totaling $9,784.67. The award of costs did not include the audit costs incurred by the Local 5 Funds, as the court deemed the request for those costs lacking in adequate detail. The parties have filed cross-appeals: G&J contends that the district court erred in allowing the plaintiffs to introduce certain testimony and other evidence in support of their claims, and the plaintiffs contend that the district court erred in denying their request for audit costs. We affirm.

## I.

The period of time relevant to this case extends from October 1, 1993 through November 14, 2002. The audit conducted on behalf of the Local 5 Funds actually extended as far back as February 1992, but the Local 5 Funds ultimately decided not to seek relief for any work performed prior to October 1, 1993. Throughout the relevant nine-year period, G&J conducted construction plastering work in Cook, DuPage, and Lake Counties (among others) in Northern Illinois. At any given time, it had between twenty-five and thirty plasterers in its employ.

Prior to November 2002, the plastering employees of G&J were represented by three different unions: Locals 56

---

(...continued)

performed by Local 5 members within Local 5's jurisdiction. But for ease of reference, we shall typically refer to the plaintiffs as the "Local 5 Funds."

and 74 of the International Union of Bricklayers and Allied Craftsmen (the "DuPage Bricklayers"), Lake County Area Plasterers' Union Local 362/11 (the "Lake County Plasterers"), and Local 5. Each union had its own geographic jurisdiction: the DuPage Bricklayers covered DuPage County, the Lake County Plasterers covered Lake County, and Local 5 covered Cook, Will, Kane, McHenry, DeKalb, Kendall, Grundy, LaSalle, and Livingston Counties. Each union had its own set of trust funds for the benefit of its members. G&J was bound to separate collective bargaining agreements with each of these unions.

Each of those agreements obligated G&J to make contributions to the various trust funds on behalf of its employees. There were six funds associated with Local 5, and along with Local 5 itself, each of those funds is a plaintiff in this suit: the Chicago Plastering Institute Pension Fund, the Chicago Plastering Institute Health and Welfare Fund, the Chicago Plastering Institute Retirement Savings Fund, the Local No. 5 Journeymen Plasterers' Protective & Benevolent Society of Chicago Apprentice & Training Fund, the Chicagoland Construction Safety Council (a Chicago-area council that promotes safe practices in the construction industry), and the Chicago Plastering Institute (a promotional trust fund that collects and forwards contributions to the Chicagoland Construction Safety Council). The first four of these funds are employee benefit funds within the scope of ERISA's section 3, 29 U.S.C. § 1002(3); the remaining two funds are non-ERISA funds.

By the terms of the collective bargaining agreements, G&J's obligation to make contributions to one union's

funds versus those of another depended not on the union to which an employee belonged, but rather on the geographic territory in which the employee performed plastering work. So whenever a G&J employee performed plastering work within the territorial jurisdiction of Local 5, G&J was obligated to make contributions to the Local 5 Funds based on that work, regardless of whether the employee performing the work was a member of Local 5, the DuPage Bricklayers, or the Lake County Plasterers. Similarly, G&J was separately obliged to deduct working assessments (i.e., union dues) from payments made to Local 5 members for work they performed within Local 5's jurisdiction. Those assessments were payable to Local 5 itself rather than to the Local 5 Funds.

As it turns out, however, G&J's contractual obligation to make contributions based on the territory in which its employees performed plastering work was to a significant extent superseded or rendered moot by two external sets of agreements among the union locals and their funds.

First, as to two of the three unions that represented G&J's employees prior to the November 2002 election, G&J's contractual obligation to make fringe benefit contributions based on the territory in which work was performed was superseded by a separate directive to make all contributions to the union that represented a given employee—his "home local"—and to the fringe benefit funds affiliated with that union. Beginning in 1991, the Northern Illinois District Council of Operative

Plasterers and Cement Masons' International Association (the "OP Council"), a collective of union locals representing plasterers and cement masons including Local 5 and the Lake County Plasterers, required contractors who employed members of those locals to pay both benefits and working assessments directly to a member's benefit office and local union, regardless of where the employee was performing his work. That rule is known colloquially as the "money-follows-the-man" rule. The rule did not apply to work performed by members of the DuPage Bricklayers, which was not a member of the OP Council. Thus, as to G&J's employees who were members of the DuPage Bricklayers, the company's contractual obligation to make contributions based on where the employee's work was performed remained unaltered. This meant that when a member of the DuPage Bricklayers performed plastering work in Local 5's territory, G&J was obligated to make contributions to the Local 5 Funds. By contrast, for work performed by members of Local 5 or the Lake County Plasterers, the company would make contributions based on the union membership of the employee performing the work, no matter where the employee's work was performed. As we shall see, the money-follows-the-man rule had the effect of confining the bulk of G&J's liability in this case to work performed by members of the DuPage Bricklayers.

Second, certain of the Local 5 Funds had reciprocal agreements with their counterparts at other unions, including the DuPage Bricklayers Funds, pursuant to which they would forward contributions received for work performed within Local 5's jurisdiction by

members of other unions to the funds affiliated with the home locals of those workers. Local 5's health and welfare fund and its pension fund both were parties to such agreements. In terms of the damages that the Local 5 Funds sought in this case for work performed by the DuPage Bricklayers members within Local 5's territory, the reciprocal agreements took the company's obligations to those two funds off the table.

In November 2002, the National Labor Relations Board ("NLRB") conducted an election among G&J's plastering employees to determine which union would thereafter serve as their exclusive collective bargaining representative. The NLRB certified the DuPage Bricklayers as the winner of that election on November 14, 2002. As a result, Local 5 ceased being the representative of any of G&J's plastering employees, G&J "exited" the collective bargaining agreement with Local 5, and G&J had no obligation to make contributions to Local 5 or to any of its fringe benefit funds for plastering work performed after November 14, 2002.

The end of Local 5's tenure as a representative of G&J employees and G&J's corresponding obligations under the collective bargaining agreement with Local 5 triggered an exit audit to determine the amounts of any outstanding obligations to the Local 5 Funds. The plaintiffs informed G&J that their auditors, the firm of Piotrowski & Gebis ("P&G"), would be reviewing G&J's contributions for the period from February 1, 1993 through Novem-

ber 14, 2002.[3] That audit commenced in February 2003. Problems soon emerged. In response to a questionnaire from the Local 5 Funds, G&J revealed that it had been making contributions based on the home local of each employee rather than the location of the work performed, as required by the various collective bargaining agreements. Still, it was possible, in view of the money-follows-the-man rule and the reciprocal arrangement that some of the Local 5 Funds had with their counterpart funds, that the Local 5 Funds had received some if not all of the monies to which they were entitled despite G&J's error in the method of contribution. The Local 5 Funds decided that they would have their auditors review G&J's work records for the last eighteen months of the audit period. G&J had preliminarily indicated that it had records as to the location of the work performed by its plasterers going back that far. If analysis of the records for that period revealed that the Local 5 Funds had been paid what they were entitled to, then the Funds would assume that G&J had paid them what they were owed in prior years. But when P&G asked the company to provide whatever work location records it had for that purpose, G&J finally disclosed that in fact it had *no* records showing where its employees had performed their work. Testimony at trial would later lead the trial court to find that G&J had never kept such records, notwithstanding its contractual obligation to make employee benefit contributions based on the territory in which each employee was engaging in plastering work.

---

[3] The trial testimony suggested that this was the first audit conducted at G&J since 1989, when one of its founding partners left the business.

P&G thus was left to its own devices in attempting to determine the extent of G&J's outstanding liability to the Local 5 Funds. Based on G&J's payroll records, the auditors attempted to ascertain instances in which the company should have made, but in fact did not make, contributions to the Local 5 Funds for work performed within Local 5's jurisdiction. Having in mind the money-follows-the-man rule that applied to members of Local 5 and the Lake County Plasterers, the auditors' principal focus was on the hours worked by members of the DuPage County Bricklayers. G&J owed contributions to the Local 5 Funds for any hours worked by DuPage Brick-layers within Local 5's territory. But because G&J's records did not reveal where individual employees worked on any given day, the dilemma posed to P&G was how to determine what the company actually owed the Local 5 Funds for work performed by DuPage Bricklayers in Local 5's territory. Given the lack of the data neces-sary to make that determination, the auditors applied a set of assumptions to the data available to them and prepared what is known as a Report On Agreed-Upon Procedures, with the "procedures" being the assumptions agreed to between P&G and its clients. For example, because G&J's records did not reveal the locations in which its employees had worked on any given day, P&G assumed that all work performed by members of the DuPage Bricklayers during the audit period was work performed within Local 5's territory, such that the com-pany should have made contributions to the Local 5 Funds (excluding the pension and health and welfare funds, which had reciprocal agreements with their coun-

terparts) for the entirety of that work. G&J's records also revealed that the company had paid a number of bonuses to its plasterers. But because G&J had no written bonus plan and no documentation of the basis for the bonuses, P&G assumed that all such bonus payments were really compensation for hours worked and that contributions to the Local 5 Funds should have been made based on these payments. P&G applied these and other assumptions to G&J's payroll data and came up with a calculation of what G&J owed the Local 5 Funds in delinquent contributions. P&G partner Gary Gebis would later discuss the set of assumptions P&G auditors had applied both in his deposition and in his trial testimony. Gebis made clear that he did not vouch for the accuracy of the assumptions. P&G's report, issued in April 2004, thus was not one which expressed a professional opinion as to how much G&J actually owed in delinquent opinions. Instead, it simply reflected what the company might owe the Local 5 Funds given the application of the various assumptions to G&J's payment records.

The P&G report set forth roughly four categories of work hours for which it was posited that contributions were owing to the Local 5 Funds and to Local 5 itself: (1) jurisdictional hours, based on the assertion that G&J had erroneously made contributions to the DuPage Bricklayers Funds rather than the Local 5 Funds for work that was performed within Local 5's territory, (2) hours corresponding to payments given to employees that the company described as bonuses (and as such would be exempt from any contribution requirement) but which

P&G had assumed were actually for work performed, (3) working assessments (dues) owed to Local 5 for hours worked by Local 5 members within Local 5's jurisdiction, and (4) other hours for which P&G believed contributions were owed. By P&G's calculation, the contributions and working assessments owed on these hours totaled $849,982.72. That total was later reduced to $815,861.02 when the plaintiffs withdrew, inter alia, any claims for work performed from February 1, 1993 through September 30, 1993. G&J rejected the analysis of the audit in toto and denied any liability for unpaid contributions.

Local 5 and the Local 5 Funds filed this suit while the audit was underway. The parties consented to final disposition by Magistrate Judge Schenkier, who conducted a three-day bench trial. Over G&J's objection, Judge Schenkier admitted P&G's audit report into evidence and permitted Gebis to testify about the report although he was not one of the line accountants who had conducted the audit and prepared the report.

Pursuant to a detailed set of factual and legal findings, Judge Schenkier found G&J liable to the Local 5 Funds for delinquent contributions, although he did not accept as valid all of the assumptions underlying the P&G audit and thus deemed G&J liable for a lesser amount than the plaintiffs had claimed. *Trustees of Chicago Plastering Inst. Pension Trust v. Cork Plastering, Inc.*, 2007 WL 6080197 (N.D. Ill. Aug. 27, 2007).

The court concluded first that G&J had breached the collective bargaining agreement with Local 5 by failing

to make contributions based on work performed by members of the DuPage Bricklayers within Local 5's territory. *Id.,* at *22. The plaintiffs bore the burden of showing the number of hours for which contributions were owed, and normally this would simply be a matter of setting forth the number of hours worked within their jurisdiction. *Id.,* at *22-*23. But G&J had failed to keep records that would permit such a showing although, the court pointed out, ERISA required it to keep such records. *Id*., at *23, citing 29 U.S.C. § 1059(a)(1) and *Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 786 (7th Cir. 2007).[4] G&J's breach of this obligation did not relieve the Local 5 Funds of their burden of proof, nor did it permit pure speculation as to the number of hours that should have been reported but were not. 2007 WL 6080197, at *23.

As a factual matter, the judge rejected G&J's representation that its practice was to assign workers to jobs within the territory of their home locals, such that a DuPage Bricklayers member typically would have worked primarily in DuPage County and would rarely if ever have been assigned to work in Local 5's jurisdiction. *Id.,* at *9-*12. The court noted among other points that although a significant number of G&J's plasterers were members of the DuPage Bricklayers, G&J did substantially more work in Local 5's territory than in the DuPage Bricklayers'

---

[4] Section 1059(a)(1) requires an employer to "maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees."

jurisdiction, so "there was a compelling need to assign members of [the DuPage Bricklayers] to perform plastering work in Local 5 territory." *Id.,* at *9. The court surmised, then, that members of the DuPage Bricklayers had in fact done some work within Local 5's territory, and that G&J had improperly made contributions to the DuPage Bricklayers Funds for that work rather than to the Local 5 Funds. *Id.,* at *12.

"But 'some' does not mean 'all.' " *Id.* The court found no factual basis for the plaintiffs' premise, reflected in the P&G report, that *all* work performed by the DuPage Bricklayers members was performed within Local 5's jurisdiction, in view of evidence that some twenty-nine percent of G&J's billings during the relevant time period were for work performed outside of Local 5's territory and twelve and one-half percent were for work done within the DuPage Bricklayers' territory. *Id.*

However, given that seventy-one percent of G&J's total billings were for work performed in Local 5's territory, the court found it reasonable to infer that seventy-one percent of its total work hours should have been reported to Local 5, with corresponding contributions. *Id.,* at *13. Yet, it appeared that G&J had only reported forty-one percent of its hours to Local 5. *Id.* The court inferred that the difference—some 150,980 hours—comprised hours that were worked by members of the DuPage Bricklayers within Local 5's territory and that should have been reported to Local 5 but had not been. *Id.* The court deemed the company liable to the Local 5 Funds for those hours. *Id.*

The court went on to reject the plaintiffs' bonus claim. *Id.*, at *14-*17, *25. Notwithstanding the lack of a written bonus plan, the court found no support for the notion that the bonus payments represented compensation for hours worked. Instead, the evidence showed that these were truly bonuses. *Id.*, at *14-*17, *25.

The court agreed that Local 5 itself was owed assessments (dues) for work performed by its members within Local 5's territory. *Id.*, at *19-*21. The evidence indicated that there were twenty-four G&J employees reported as Local 5 members during the audit period, but the P&G report indicated that dues had not been contributed for some 6,810 hours worked by these employees within Local 5's territorial jurisdiction. *Id.*, at *20.[5] G&J was liable to Local 5 for these hours. *Id.*, at *25, *29.

Finally, the court found G&J liable for certain other categories of unreported hours. These included some 560 hours worked by an individual G&J classified as a manager but whom the court found to have been engaged in plastering-related work for which the company was obliged to make contributions. *Id.*, at *17, *25 & n.6. There were also some 370 hours categorized by G&J as "shop work," which would be exempt from any obligation to make fringe benefit contributions, but

---

[5]  Over two-thirds of these hours had simply gone unreported, although there was no dispute that Local 5 was owed assessments for these hours. Some had been miscategorized as management hours, whereas others had been mistakenly reported to the DuPage Bricklayers instead of Local 5. 2007 WL 6080197, at *20 n.4.

which the court found were actually hours devoted to plastering work. *Id.,* at \*18-\*19, \*25 & n.6. And finally, there were 10,088.75 hours that G&J claimed it had reported to the Local 5 Funds but which the court found it had not. *Id.,* at \*17-\*18, \*25 & n.6.

The court concluded that G&J was liable for a total of 161,998.75 hours of unreported work to the four Local 5 Funds that qualified as employee benefit funds under ERISA, another 11,018.75 hours to the Chicagoland Construction Safety Council, a non-ERISA fund, and 6,810 hours to Local 5 for working assessments. *Id.,* at \*30. The court directed the parties to calculate the amounts of contributions and union dues owed for those hours. The court also indicated it would add an award of prejudgment interest at the rate of one percent per month pursuant to 29 U.S.C. § 1132(g)(2)(B). *Id.* It announced its intent to impose an additional amount equal to the award of prejudgment interest as further damages, pursuant to the "double-interest" provision of section 1132(g)(2)(C)(i). *Id.* Finally, the court acknowledged that section 1132(g)(2) provides for awards of attorney's fees and costs, including audit costs, and indicated that it would set a schedule for the submission of materials that would permit the court to determine what amounts to award the plaintiffs for those fees and costs. *Id.,* at \*31.

The parties subsequently prepared a joint submission reflecting agreement as to some but not all of the amounts owed pursuant to the court's liability decision. R. 117. One of the items as to which the parties disagreed was the reasonableness of the $45,435.00 in audit costs for which

the plaintiffs were seeking recompense. Although the documentation produced to G&J in support of those costs revealed the hours spent month by month on the audit, the total amounts charged to the Local 5 Funds for those hours, and the P&G employees who worked on the audit, the submitted materials did not disclose the qualifications, experience, and billing rates of the individual auditors nor were the time records itemized to reflect what tasks each individual auditor had been working on at any given time and the total hours spent on various aspects of the audit.

In a set of supplemental findings and legal conclusions, the court awarded the plaintiffs $1,109,466.23 for unpaid contributions and union dues and prejudgment interest (and double interest), R. 128, but the court sustained G&J's objections to the audit costs and denied the plaintiffs' request for these costs in toto, *Trustees of Chicago Plastering Inst. Pension Trust v. Cork Plastering, Inc.*, 2007 WL 3449493 (N.D. Ill. Nov. 14, 2007). The court found it reasonable to expect that a request for an award of audit costs be supported by the same type of detail used to support attorney-fee requests. Absent such detail, the court believed that it could not properly assess the reasonableness of the requested costs. *Id.*, at *2. The court subsequently signed off on the plaintiffs' bill of costs in the reduced amount of $9,784.67. R. 131.


## II.

The parties present us with three issues on appeal, all of them related to the audit. G&J contests the district court's

decision to admit the P&G Report On Agreed-Upon Procedures into evidence. G&J views the audit report as being founded on inadmissible hearsay; it also contends that the report was prepared in anticipation of litigation and is not otherwise admissible as a business record. Second, G&J argues that the court should not have allowed Gebis to testify about the report. The company reasons that Gebis was not one of the line auditors involved in conducting the audit and preparing the report; nor was Gebis qualified as an expert who could opine about the company's liability to Local 5 and its Funds. Finally, the plaintiffs cross-appeal, contesting the district court's decision to deny them any compensation for the costs of the audit. In their view, the court inappropriately held their request for audit costs to the same standards applied to attorney-fee requests and, alternatively, failed to give them advance notice of its intent to apply those standards and a reasonable opportunity to meet them.

## A.  The P&G audit report

The data underlying the P&G report was, as we discussed earlier, derived from G&J's payroll records. But the report's conclusions as to what G&J owed Local 5 and the Local 5 Funds based on that data were driven by a set of procedures or assumptions agreed to by P&G and its clients. The report was not an audit opinion in the sense that it expressed a professional judgment about what G&J owed the plaintiffs; P&G did not vouch for the validity of the assumptions employed but merely

tabulated what the company might owe assuming the validity of the assumptions.

The district court overruled G&J's objections to the admissibility of the report on several grounds. First, the court noted that the data underlying the report was derived from the company's own payroll records. G&J did not object to the authenticity or reliability of its records, nor did it contest the accuracy of the data pulled from those records. 2007 WL 6080197, at *24; R. 148-1 at 104-05. G&J's real objection was to the set of assumptions that P&G had applied to the data. Although those assumptions were based to some extent on out-of-court discussions between the auditors and their clients, that fact did not render the report itself hearsay. R. 148-1 at 105. The court noted that the assumptions were also based on what the auditors had discovered in the course of their audit. R. 148-1 at 103-04. Moreover, Gebis testified and was subject to cross-examination as to what the assumptions were and what they were based on. R. 148-1 at 105. Ultimately, the court concluded that doubts as to the sufficiency and reliability of the assumptions went to the weight to be given to the report rather than its admissibility. R. 148-1 at 104, 105. "[I]f I find that the procedures were good and that the analysis was correct, I'll accept it," the court observed. R. 148-1 at 117. "[I]f I don't, I won't." *Id.* And as we have discussed, the court went on to accept some of the assumptions set forth in the report as valid and rejected others. For purposes of calculating the total number of hours for which G&J owed the plaintiffs contributions and working assessments, the court did rely on the report's underlying data as to the

hours falling into various categories, as there was no objection to the accuracy of the data summarized in the report.

G&J's threshold contention here is that the report should have been excluded from evidence because it contains inadmissible hearsay. This is not literally true: the report is a long series of tabulations based on G&J's payroll records and it does not repeat any out-of-court statements. But the report's conclusions do reflect a series of assumptions—for example, that all hours reported to the DuPage Bricklayers Funds were for work performed within Local 5's territory and thus contributions for those hours should have been made to the Local 5 Funds rather than to the DuPage Bricklayers Funds. As discussed, the Local 5 Funds agreed upon these assumptions with their auditors, presumably in out-of-court discussions and correspondence with P&G, which in turn prepared the report in accord with those assumptions; the report is thus entitled "Report On Agreed-Upon Procedures." Although the report does not recount these discussions, G&J reasons that the report is necessarily based on the marching orders that P&G was given and to that extent the report is the product of inadmissible hearsay.

There is no merit to this argument. The assumptions that P&G applied in preparing the report obviously were important in assessing the validity of the report's assertions as to what G&J owed Local 5 and the Local 5 Funds. But the fact that those assumptions were conveyed to the auditors in out-of-court discussions is neither here nor there: the content of those discussions was not being

offered into evidence, let alone for its truth, nor was it necessary to recount such conversations in order to evaluate the merit of any assumption that P&G employed. Auditors, like other professionals, are often asked to analyze data based on a set of assumptions given to them. *See* Am. Inst. Of Certified Public Accountants Professional Stds., AT § 201 (describing agreed-upon procedures engagements). The assumptions that P&G applied to the data were not a secret. Gebis was deposed before trial, and he answered G&J's questions at that time about the nature of the assumptions underlying the report; he was similarly examined and cross-examined at length during the trial on the subject of these assumptions. The assumptions were not based on facts that were known only to the plaintiffs and communicated in secret to P&G; they instead reflected the plaintiffs' conclusions about how various categories of hours and payments reflected in G&J's records should be treated in assessing G&J's liability to the Local 5 Funds. As the district court recognized, these assumptions in fact were derived from what G&J's own records disclosed or failed to disclose about its methodology in reporting hours and making contributions to the various union locals and their respective funds. For example, the assumption that all hours reported by members of the DuPage Bricklayers represented work performed within Local 5's jurisdiction was premised on G&J's failure to keep records as to the jurisdictions in which its plasterers were working at any given time. Similarly, the assumption that the bonuses G&J paid to its employees were not truly bonuses but rather were disguised payments for

hours worked was based on G&J's lack of a written bonus plan or other documentation setting forth the criteria for the bonuses. P&G did not vouch for the accuracy of the assumptions, nor did the court admit P&G's report on the premise that those assumptions were accurate. The validity of the assumptions that the auditors applied was debated throughout the proceedings in light of the testimony and other evidence as to G&J's practices. It was that evidence, and not the content of any out-of-court communications between P&G and its clients, that led Judge Schenkier to accept some of the assumptions as accurate and to reject others as unsubstantiated. There was no error in admitting the report simply because it reflected these assumptions.

We also reject G&J's contention that the report should have been excluded on the basis that it was not made or kept in the ordinary course of business and was prepared for purposes of litigation. *See* Fed. R. Evid. 803(6) (deeming generally admissible records of regularly-conducted business activity); *United States v. Blackburn*, 992 F.2d 666, 670 (7th Cir. 1993) (noting "well-established rule that documents made in anticipation of litigation are inadmissible under the business records exception"); *see also Lust v. Sealy, Inc.*, 383 F.3d 580, 588 (7th Cir. 2004). G&J may well be right that the report itself does not qualify as a business record. The testimony at trial did not reveal any program by which the Local 5 Funds routinely audited employers; in fact, it appears that G&J was last audited in 1989. R. 148-1 at 44-45. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258 (9th Cir. 1984) (where trust funds had no routine audit practice, compliance

audit report prepared when funds suspected employer may not have complied with its contribution obligations not admissible as business record), *cited with approval in AMPAT/Midwest, Inc. v. Ill. Tool Works Inc.*, 896 F.2d 1035, 1044-45 (7th Cir. 1990). But the report would in any event qualify for admission as a summary of voluminous business records—namely G&J's own payroll records. *See* Fed. R. Evid. 1006; *e.g., United States v. Weaver*, 281 F.3d 228, 232-33 (D.C. Cir. 2002). The report, as we have discussed, merely tabulates data from G&J's records to show what the company might owe given certain assumptions. G&J does not contend that either the underlying data or P&G's calculations are inaccurate. Its quarrel has always been with the assumptions that the auditors applied to the data. As we have discussed, those assumptions were fully aired and their validity was assessed by the court based on the totality of the evidence. To the extent a given assumption was found to be invalid, the court rejected the report's application of that assumption. But the payroll data summarized in the report was accurate, and the court committed no error in admitting the report as a summary of that data. *See AMPAT/Midwest, Inc.*, 896 F.2d at 1045.

B.   Testimony of Gary Gebis

Gebis, as we have noted, testified at length as to the preparation of the report, the assumptions reflected in the report, and the report's conclusions as to what G&J purportedly owed to Local 5 based on the application of those assumptions to the company's payroll records. The

district court found that Gebis was sufficiently involved in the P&G audit to enable him to testify about the audit report and to lay a foundation for its admission. The court noted that Gebis was P&G's liaison with the plaintiffs and in that capacity regularly communicated with them about the audit; he spoke regularly with the field auditors; and he signed off on the audit report after reviewing all of the pertinent working papers. 2007 WL 6080197, at *24; R. 148-1 at 104.

G&J nonetheless argues that the district court should not have allowed Gebis to testify about the report. As it did below, the company contends that because Gebis was not one of the field auditors who did the legwork culminating in the report, he lacked sufficient personal knowledge about the report to give testimony about it. G&J also suggests that Gebis should not have been permitted to testify without being qualified as an expert witness pursuant to Federal Rule of Evidence 702.

Contrary to G&J's contention, Gebis was certainly qualified to lay a foundation for the admission of the report notwithstanding the fact that he was not one of the line accountants who actually conducted the audit. The record reveals that Gebis, as the liaison with the Local 5 Funds, was in regular contact with the field auditors, met with them to review their progress, consulted with them when problems arose, and reviewed both their work papers and the final report. Gebis himself recalculated all of the totals in the report prior to his testimony to satisfy himself of their accuracy, and he had also reviewed the report overall to ensure that it complied with the

standards of his firm and the American Institute of Certi-
fied Public Accountants. R. 148-1 at 62. Gebis was conver-
sant with the data and assumptions underlying the
report and testified at length about both during the trial.
He was qualified to lay an appropriate foundation for
the report and did so.

The notion that Gebis was called on to deliver opinion
testimony and thus had to first be qualified as an expert
witness pursuant to Rule 702 is mistaken. Gebis certainly
had expertise as a certified public accountant, but neither
his firm's report nor his testimony embodied an audit
opinion in the usual sense. Again, the report P&G prepared
reflects the analysis of data from G&J's payroll records
in light of certain assumptions. The validity of those
assumptions was addressed and resolved separately at
trial. Neither party treated the report as that of an expert,
and G&J's own briefs acknowledge as much. The district
court itself noted that Gebis had not been tendered as
an expert witness. R. 148-1 at 165-66.


C.  Plaintiffs' audit costs

The plaintiffs challenge the district court's denial of their
request to recover their auditors' fees. The collection and
audit policy applicable to the Local 5 Funds does not
provide for cost-shifting, as the district court noted in its
initial opinion on this subject. 2007 WL 3449493, at *3. But
ERISA itself grants the district court authority to award
the plaintiffs their reasonable attorney's fees and costs
in successful actions to collect unpaid fringe benefit
contributions owed to multi-employer plans, 29 U.S.C.

§ 1132(g)(2)(D), along with "such other legal or equitable relief as the court deems appropriate," *id.* § 1132(g)(2)(E). This court, among others, has construed the latter provision to include an award of audit costs. *Moriarty ex rel. Local Union No. 727, I.B.T. Pension Trust v. Svec*, 429 F.3d 710, 721 (7th Cir. 2005) (citing *Operating Eng'rs Pension Trust v. A-C Co.*, 859 F.2d 1336, 1343 (9th Cir. 1988)).

As we noted earlier, the district court's decision to deny the plaintiffs' request turned on the adequacy of the documentation the plaintiffs submitted in support of their requests.

Plaintiffs contest the decision on two grounds. First, they contend that there is minimal precedential support for the court's decision to judge audit-cost requests by the same standards applied to attorney-fee requests. They note that only a few district courts have taken that path, whereas other courts have approved requests without the level of detail required for attorney's fees. Second, they assert that the district court held them to attorney-fee standards without adequate forewarning and without giving them a reasonable chance to comply with its expectations. In view of the latter argument, we now take the opportunity to set forth in greater detail how this issue was developed, argued, and decided below.

In connection with the parties' joint submission on damages, which followed up on the court's liability findings, Gebis submitted an affidavit identifying various calculations of the amounts due to the plaintiffs, and at the conclusion of that affidavit he stated that "[m]y firm's fees related to this matter since its inception and

through October 17, 2007 are $45,435.00." R. 117, Gebis Dec. ¶ 7. No additional detail was provided (although P&G's time records had been produced to G&J). In the parties' joint submission noting the defendant's objection to an award of audit costs, G&J maintained that without supporting documentation itemizing the work performed, totaling the hours spent on each aspect of the audit, and identifying the individuals who performed the work, their qualifications, and their hourly rates, the court could not engage in an appropriate review of the reasonableness of the costs requested. R. 117 at 9.

Subsequent to the filing of the joint submission, the plaintiffs were given leave to file a memorandum addressing the objections set forth by G&J in that submission to, among other things, the demand for audit costs. R. 124. With the support of a supplemental declaration from Gebis, the plaintiffs contended that the documentation they had submitted in support of the fee request was adequate to establish its reasonableness. R. 124 at 6-7. Attached to Gebis's supplemental declaration were copies of P&G's time records, which had been provided to G&J's counsel before the joint submission was filed. Those records reflected the hours expended on the audit by P&G personnel during each semi-monthly period. The plaintiffs also noted that G&J had been provided with documentation as to which P&G auditors had worked on the audit on any given day and for how long. However, the firm's auditors did not keep records detailing the particular tasks in which they were engaged at any one time. R. 124 at 6. Nonetheless, the plaintiffs contended that the lack of such detail did not warrant

denying the plaintiffs an award of their audit costs. There was no allegation that the auditors had inflated their hours; and the audit was complex, in no small part due to G&J's failure to keep records of where its employees were working. R. 124 at 7. In his supplemental declaration, Gebis stated that his firm had spent approximately 240 hours between December 1, 2002 and June 30, 2004, primarily on the audit and preparation of the report, and another 260 hours from June 30, 2004 to October 17, 2007, primarily on the litigation. R. 124, Ex. 4, Gebis Supp. Decl. ¶ 3. Records attached to his declaration identified twelve different individuals who performed work related to the audit.

As we have noted, the court denied the plaintiffs' request for audit costs. 2007 WL 3449493. The court found that the plaintiffs had not sustained their burden of establishing the reasonableness of the costs they sought:

> We have no reason to doubt that plaintiffs' records accurately state the time the auditors devoted to this matter. However, neither the records nor Mr. Gebis's declaration discloses the background or experience of each of these individuals; the rates at which their time was billed; or what specific work each auditor performed on each date. Indeed, Mr. Gebis states that "P&G's auditors do not make contemporaneous records, and P&G does not maintain records, of the particular audit tasks in which each auditor is engaged for each of the hours indicated in P&G's billing records." ([R.124], Ex. 4 ¶ 2.) As a result, the Court is unable to ascertain what work each

individual did on a given day; whether there was any unnecessary duplication of efforts owing to the large number of people who were assigned to work on the task; o[r] whether the hourly rates charged for the services are reasonable rates charged generally in the market for auditors with comparable experience performing comparable tasks.

*Id.*, at *2. The court noted that such detail is routinely expected in support of requests for attorney's fees under fee-shifting statutes, and in the court's view, it was appropriate to demand such detail in support of a petition for audit fees pursuant to section 1132(g)(2)(E). *Id.*, citing *Trustees of Plumbers Local Union No. 1 Welfare Fund v. Philip Gen. Constr.*, 2007 WL 3124612, at *14 (E.D.N.Y. Oct. 23, 2007); *King v. JCS Enters., Inc.*, 325 F. Supp. 2d 162, 173-74 (E.D.N.Y. 2004).

The court later denied the plaintiffs' motion to reconsider its ruling. *Trustees of Chicago Plastering Inst. Pension Trust v. Cork Plastering, Inc.*, 2007 WL 4240739 (N.D. Ill. Nov. 26, 2007). The court rejected in the first instance the plaintiffs' contention that because there was no local rule requiring the type of detail the court had demanded in support of an award of audit fees—as there was with respect to attorney's fees, *see* N.D. Ill. Local Rule 54.3—such detail was not required. "The local rules of this district do not set forth specialized requirements for presenting disputes about an award of taxable costs under Fed. R. Civ. P. 54(d), but no one would seriously dispute that those costs may not be awarded unless they were necessarily incurred and reasonable in amount." 2007 WL

4240739, at *1 (citing *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 427-29 (7th Cir. 2000)). It was the plaintiffs' burden to establish the reasonableness of the audit costs they were seeking, and the absence of a local rule identifying what type of proof would suffice did not relieve them of that burden. *Id.* Nor was the court persuaded to change its mind by the plaintiffs' citation to other district court decisions which had awarded audit fees based on proof comparable to that Gebis had tendered. *See id.*, at *2. The court noted that in some of those cases, the fee requests were relatively small. In other instances, the fee requests rested on contractual cost-shifting positions rather than statutory provisions. But, in any case, the fact that other courts, in the exercise of their discretion over such requests, had not required the level of detail that the court expected in this case in no way suggested that it was beyond the court's discretion to demand such support. *Id.* On similar grounds the court dismissed the notion that because P&G had never kept itemized records of what its auditors were doing at any particular time, the court's insistence on such detail was unprecedented and therefore unfairly applied. *Id.*, at *3. "[T]he auditors' record keeping choices do not dictate what is required under ERISA in order for the Court to decide whether, and what, audit costs are reasonable and should be borne by defendant." *Id.* Finally, the court rejected the plaintiffs' alternative request that they be given another opportunity to supplement their audit-cost request in an effort to satisfy the court that at least some portion of the costs they had incurred were reasonable and should be awarded:

While plaintiffs may have been able to provide evidence to show the reasonableness of at least some of the audit costs, that is now a moot point. The time for plaintiffs to have made the effort to do so was before the Court's ruling, not in a motion to reconsider. Plaintiffs well knew that G&J asked the Court to deny any audit costs as a result of plaintiffs' failure to substantiate their reasonableness. Plaintiffs filed a brief and a supplemental declaration from their auditor, Mr. Gebis, arguing that their substantiation was sufficient to support a full award of audit costs. Now that we have disagreed, plaintiffs are not entitled to a second bite at the apple to attempt to provide evidence that they should have provided—if they were able to do so—prior to our ruling.

*Id.* (record citations omitted).

We have no doubt that it was within the court's discretion to require the additional details it found missing from the plaintiffs' documentation. A district court necessarily must assess the reasonableness of any fees and costs requested. *See Moriarty*, 429 F.3d at 721 ("attorneys' fees and costs must be reasonable"). The audit costs requested by the plaintiffs were driven by the same two basic factors as attorney-fee requests—the number of hours expended on the audit and the litigation, along with the hourly billing rates of the auditors who worked on the matter. The reasonableness of an attorney's billing rate depends on the experience and qualifications of the professional. *See, e.g., Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*, 553 F.3d 487, 490 (7th Cir. 2009) (citing

*Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 555 (7th Cir. 1999)); *Gautreaux v. Chicago Hous. Auth.*, 491 F.3d 649, 659 (7th Cir. 2007). The reasonableness of the time expended by an attorney on behalf of a client depends not only on the total number of hours involved but also on the particular tasks to which the attorney devoted his or her time. *See, e.g., A. Bauer Mech., Inc. v. Jt. Arbitration Bd. of Plumbing Contractors' Ass'n*, 562 F.3d 784, 793 (7th Cir. 2009); *Lightfoot v. Walker*, 826 F.2d 516, 520-23 (7th Cir. 1987). It is not at all unusual for a court to determine that some aspects of an attorney's work were not fruitful, were unnecessary, or merited less time than the attorney devoted to them, and to deny compensation for those portions of the attorney's work. *E.g., JCW Investments, Inc. v. Novelty, Inc.*, 509 F.3d 339, 342-43 (7th Cir. 2007). An auditor, like an attorney, is a professional whose time is valued, to a great extent, by his experience and credentials. As is also true of an attorney's work, the reasonableness of the time an auditor has devoted to his client's cause depends on both the particular tasks he performed and the time he expended on those tasks. We can think of no reason why the work of lawyers and auditors is so different that the reasonableness of their fees must be judged by different standards.

Consequently, it is entirely reasonable for a court asked to compensate a party for the audit costs it has incurred to demand information about the credentials and billing rates of the auditors, along with itemization of the time they devoted to the case. This information enables the court to both assess the overall reasonableness of the compensation requested and, if the court believes

the total fees were too high, to have a reliable basis for reducing the fee award by denying compensation for time that was not well spent or reducing compensation for time that was billed at excessive rates. Itemization may not be necessary in all cases. Where an audit was straightforward, the total number of hours devoted to the audit was low, and the court has no reason to believe that certain aspects of the audit were a waste of time, the court may not feel it needs additional detail. But this was a fairly significant audit, and the dollar amount sought by no means minor. Moreover, the court knew that there were certain aspects of the audit—*e.g.,* the claim that bonus payments were really payments for hours worked—that it had rejected. In this context, it was wholly reasonable for the court to expect more detailed records in support of the costs requested, so that the court could engage in an appropriate review of the reasonableness of the request. *See Masino v. Tucci Equip. Rental Corp.*, 2008 WL 5451005, at *1-*2 (E.D.N.Y. Nov. 20, 2008) (Levy, M.J.), *adopted*, 2008 WL 5274342 (E.D.N.Y. Dec. 19, 2008) (Block, J.); *Teamsters Local 814 Welfare Fund v. Dahill Moving & Storage Co.*, 545 F. Supp. 2d 260, 269-70 (E.D.N.Y. 2008) (Sifton, J.); *Trustees of Plumbers Local Union No. 1 Welfare Fund v. Philip Gen. Constr., supra*, 2007 WL 3124612, at *14 (Gershon, J.); *King v. JCS Enters., supra*, 325 F. Supp. 2d at 173-74 (Young, C.J.); *Trustees of Four Jt. Bds. Health & Welfare & Pension Funds v. Penn Plastics, Inc.*, 864 F. Supp. 342, 350-51 (S.D.N.Y. 1994) (Leisure, J.).

The plaintiffs were not deprived of adequate warning that the court might hold them to these standards. It should not have been a surprise to the plaintiffs that

the court might deny their request for costs absent the details that the court found lacking. First, information as to the credentials of a professional and her billing rates, and an itemized record of the time she devoted to particular tasks, are common-sense requirements. Such detail is routinely expected in support of attorney-fee requests, and the plaintiffs have supplied us with no logical reason to think that audit fees should be treated differently. The plaintiffs also knew there were at least some cases requiring such detail by virtue of G&J's citation to one such case in support of its objections to audit costs. R. 117 at 8, citing *King*, 325 F. Supp. 2d 162. Second, G&J did expressly object to the costs on the ground they were not adequately supported. G&J's objections were set forth in the parties' joint submission to the court, and the plaintiffs had the opportunity to address those objections in their response. They did respond, in fact, but rather than attempting to supply the additional documentation that G&J demanded, the plaintiffs instead contested the validity of G&J's objections. Even in the plaintiffs' motion for reconsideration, the plaintiffs did not take the opportunity to supply the level of detail the court was seeking.[6]

---

[6] It is true that, at the conclusion of its liability opinion, the district court said that it would set a briefing schedule on unresolved issues such as the plaintiffs' audit costs, attorneys' fees, and court costs. 2007 WL 6080197, at *31. The parties instead initiated that briefing with their joint submission on damages, which set forth the items, including audit costs, as to which they could not agree. In any event, the plaintiffs had

(continued...)

Any party seeking an award of costs carries the burden of showing that the requested costs were necessarily incurred and reasonable. The detail that the court expected to demonstrate the reasonableness of the plaintiffs' audit costs was sensible, the plaintiffs were on notice that G&J was objecting to the request based on the lack of such detail, and the plaintiffs had an adequate opportunity to supply such detail. Absent even such basic information as a description of the credentials and billing rates of P&G's auditors, the district court did not abuse its discretion in denying the plaintiffs' request for these costs in whole.

### III.

The district court handled this case with a commendable thoroughness and attention to detail. We find no error in its decisions to admit the P&G audit report, to allow accountant Gary Gebis to testify about that report, and to deny the plaintiffs' request for an award of their audit costs.

AFFIRMED.

---

(...continued)

the opportunity to submit their follow-up memorandum addressing G&J's objection to audit costs. The plaintiffs have not shown why this was not an entirely adequate opportunity to set forth their position and to offer any support they had for their audit costs.