**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 5, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MCC MANAGEMENT OF NAPLES,
INC., a Florida corporation; BGC II
MANAGEMENT OF NAPLES INC., a
Florida corporation; MILES C.
COLLIER, individually; BARRON G.
COLLIER, II, individually,

      Plaintiffs - Appellees,

v.

INTERNATIONAL BANCSHARES
CORPORATION, a Texas corporation;
INTERNATIONAL BANK OF
COMMERCE, a Texas corporation,

      Defendant-Third-Party-Plaintiffs
      - Appellants,

and

KRISTY CARVER,

      Defendant-Third-Party-
      Defendant - Appellee.

No. 10-6283
(D.C. No. 5:06-CV-01345-M)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **O'BRIEN**, and **MATHESON**, Circuit Judges.

---

    [*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

_____

Defendant-Appellant International Bancshares Corporation ("IBC") appeals from the judgment of the district court, after trial, in favor of Plaintiff-Appellee MCC Management of Naples ("Colliers"). The Colliers sued for breach of contract and fraud in a dispute over tax benefits. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

Background

This is a contract and tort dispute over entitlement to $16 million in tax benefits accruing over a period of years to an Oklahoma bank called Local. The "benefits" at issue are tax deductions that reduce taxable income. On one side are Miles and Barron Collier, brothers and investors, who owned Local at the time the tax benefits arose; on the other is International Bancshares Corporation, which now owns the bank. In 1988, Local began buying troubled loan assets. An agency later absorbed into the FDIC guaranteed the value of the assets; in return Local had to "share" some of its profits. When Congress repealed the deductions Local claimed on losses from these assets, Local stopped its sharing payments and sued in the Court of Federal Claims; the FDIC counterclaimed for non-payment.

Local's potential liability in the FDIC suit—possibly as much as $20 million—made prospective purchasers of the bank wary. So when, in 1997, the Townsend Group, a band of investors, purchased Local from the Colliers, the

contract (or "Redemption Agreement") required that the Colliers escrow $10 million of the $154 million purchase price on account of the FDIC liability. Local already had a $12.7 million FDIC reserve. If the FDIC won more than the combined $22.7 million, the Colliers had to indemnify Townsend/Local. The contract was designed to allow Townsend to buy Local while carving out the potential FDIC liability. In 1999, the parties signed a "Settlement Agreement" to resolve certain post-closing disputes not relevant here. What is relevant, however, are clauses in the contract that reaffirmed the terms of the Redemption Agreement as they bore on the FDIC litigation.

In 2002, Local and the FDIC settled the suit for somewhere around $25-27 million. That same day, Townsend/Local and the Colliers signed a "Resolution and Modification Agreement," or RMA. This is the nub of the conflict. Two things now happened. First, the parties signed an agreement whose effect they dispute: IBC claims the RMA released any Collier claims on Local assets, which Local takes to include the disputed tax benefits. The Colliers contend that the agreement specifically carved out from supersession their interest in these tax benefits. Second, in 2004, Local realized that by using a different method of measurement it could claim about $7 million more in tax deductions than it thought—the "Excess Basis Deduction," which increases losses attributable to already-written-down loans that are liquidated at less than book value. Local also claimed a $7 million deduction on the principal payment made to the FDIC and

some $140,000 in deductions for attorney's fees. That year IBC bought Local and inherited this dispute.

Finally, in 2006, as Local prepared for an audit of the Excess Basis Deduction, Kristy Carver, Local's "tax director," abruptly quit over what she believed was a bonus owed her for "discovering" the deduction. Instead she began consulting for the Colliers and alerted them to the millions in deductions that Local claimed. R. 15, 10891. A few months later the Colliers sued IBC/Local for these amounts on a variety of fraud and contract theories. IBC/Local counterclaimed against the Colliers, and added third-party claims against Ms. Carver for breach of confidentiality and tortious interference with contract.

The Colliers and Ms. Carver prevailed after a 17-day jury trial in March 2010. The jury found IBC liable for breach of contract. They also found that Local not only failed to disburse the tax benefits, owed by contract to the Colliers, but concealed from the Colliers that the deductions had been taken. IBC was found liable for breach of the duty of good faith and fair dealing, breach of fiduciary duty, non-disclosure, false representation, constructive fraud, and negligent misrepresentation. The jury awarded $15.8 million in compensatory damages and $1.4 million in punitive damages. The district court added $4.3 million in prejudgment interest. The final recovery was $21.6 million.

- 4 -

IBC contends that it was entitled to judgment as a matter of law or, in the alternative, a new trial. Denial of a Rule 50 motion is reviewed de novo, but IBC must prove that the evidence and its inferences (viewed in the light most favorable to its opponents) points but one way, i.e., in its favor. Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs, 613 F.3d 1229, 1235 (10th Cir. 2010). Denial of a motion for a new trial is reviewed for abuse of discretion. Minshall v. McGraw Hill Broad. Co., Inc., 323 F.3d 1273, 1283 (10th Cir. 2003). This court will reverse the denial of a motion for a new trial "only if the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. We address the issues raised in turn.

A.    Did the 2002 RMA supersede or waive the Colliers' entitlement to the tax benefits?

This is the central dispute. IBC argues that the 2002 RMA terminated any Collier claims and that the district court erred in deeming its provisions ambiguous, obligating a jury to sort out the arrangement. It points to paragraph 3 of the RMA as expressing the crucial terms. The Colliers claim that the contract did not release their claims, and, in any event, it was a good-faith dispute resolved by the jury. They look to Section 4 of the 2002 RMA, which refers to Section 7 of the 1999 Settlement Agreement, which in turn refers to the Collier's rights under Section 5.1 of the 1997 Redemption Agreement.

- 5 -

Under Oklahoma law, the determination of whether a contract is ambiguous is a question of law; but if the court determines that a contract is ambiguous, its construction depends on extrinsic evidence and interpretation becomes a question of fact. Pitco Prod. Co. v. Chaparral Energy, Inc., 63 P.3d 541, 545 (Okla. 2003). Ambiguity exists when the contract is reasonably susceptible of more than one construction, such that reasonable persons could honestly disagree as to the meaning. Id. at 545-46.

We find language in the RMA stating that its terms supersede those of prior agreements; we also find language that *prevents* such superseding effect, at least with regard to liabilities in the FDIC suit. The RMA, in Section 4 (headed "This Agreement Supersedes the Redemption and Settlement Agreements"), states, in its opening words, "Except for Section 7 of the Settlement Agreements which will remain in full force and effect as originally stated...." Then, Section 7, for its part, styled a "Mutual Release and Waiver of Claims," purports to discharge both sides from any claims—"except for any and all rights...with regard to...Section 5.1 of the Redemption Agreement...which [is] hereby expressly excepted from this mutual release and waiver." The last line in this paragraph repeats: "this Mutual Release and waiver...shall not apply to the full performance and enforcement of Section 5.1 of the Redemption Agreement."

IBC disparages this interpretation as creating a sort of Jacob's Ladder toy, in which this section refers to this section which refers back to this section. But

we find the Colliers' explanation perfectly plausible, namely, that the purpose of the drafting was to exclude from modification the terms covering the FDIC claims. This makes sense because these claims—Local's claim and the FDIC's counterclaim—were a potential liability of unknown amount. The three agreements, read together, seem only to work to set aside the whole question. Joseph Perkovich, who handled the sale of Local for the Colliers, testified that the intent was to keep Local "financially neutral" in relation to the FDIC suit. R. 15, 10827-29. "It basically took the benefits and obligations right off the bank's financial statement and put them on the Colliers' personal ledger." R. 15, 10829. Certainly the ambiguity is apparent enough for the district court to have submitted to the jury the question of the parties' intent. This court cannot set aside their finding absent a conclusion, which we are unable to make, that it was unreasonable for the jury to reject IBC's interpretation.

B.      Were the Colliers entitled to the benefit of the "Excess Basis Deduction"?

IBC claims the Excess Basis Deduction was purely an asset of the bank. Unlike the deductions on the FDIC principal payment and the attorney's fees, this deduction required no expenditure by the Colliers. Moreover, IBC claims that the provision, even if ambiguous, should have been construed against the Colliers, who purportedly drafted it. Finally, it contends it was error to allow an attorney tax expert, Mr. Scott Knutson, to testify on possible interpretations of the contract, since it claims he simply dictated the Colliers' interpretation to the jury.

The Colliers, again, see a good-faith dispute and claim ample evidence exists to show that Local received FDIC assistance on those assets from which the Excess Basis Deduction derived. They also contend that Townsend lawyers were involved in the drafting of the agreement and that their expert, approved after a Daubert hearing, refrained from stating legal conclusions.

This court reviews de novo the question of contract ambiguity. As noted, under the laws of Oklahoma, if reasonable, fair, and honest disagreement exists, so does ambiguity. Pitco Prod. Co., 63 P.3d at 545-46. We agree that the district court correctly concluded that the contract was ambiguous on this point. IBC's position—in essence, that through its own tax ingenuity it made more fruitful use of the bank's assets—is well taken, but we do not find the contracts or extrinsic evidence dispositive so as to empower us to overturn the district court (on the law) and the jury (on the facts). The Colliers can plausibly claim (though from our reading of the record it is hardly self-evident) that the Excess Basis Deduction was "related" to the FDIC litigation: the loans were "covered" under the FDIC agreement and the losses occurred during Collier ownership (1988-1993); losses allow deductions against income; the deductions therefore belonged to the Colliers. They also show that the financial advantage of such a deduction could have been claimed by the FDIC (had the agency known of it), under the "sharing" agreement, and since the Colliers were answerable for the liabilities, so too could they expect the benefits. See R. 15, 10829, 10833-34 (testimony of Joseph

Perkovich); R. 16, 11241 (testimony of Kristy Carver).

We review a district court's admission of expert testimony for abuse of discretion. To reverse we must have a definite and firm conviction that the court below "made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Hollander v. Sandoz Pharma. Corp., 289 F.3d 1193, 1204 (10th Cir. 2002).

The "mystique" that IBC claims Mr. Knutson possessed before the jury, as he discussed complex tax arrangements, is a concern with experts generally. A leading case in this circuit is Specht v. Jensen, 853 F.2d 805 (10th Cir. 1988) (en banc), where an attorney-expert, in a § 1983 suit alleging an illegal search, was examined about a "hypothetical" that was identical to the actual facts. With an "array of legal conclusions," he "painstakingly developed over an entire day the conclusion that defendants violated plaintiffs' constitutional rights." Id. at 808. This court reversed and drew the following line: expert testimony under Rule 702 is proper "if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function." Id. at 809-10. The expert can *refer* to the law in expressing his opinion, but he may not tell the jury what legal standards must guide their verdict. Id.

Mr. Knutson did not overstep this line. He discussed the "common methodology" that tax lawyers use interpreting phrases like the one at issue—"net of any related tax benefits, in respect of the FDIC counterclaim"—and suggested

three possible readings: "narrow," "intermediate," or "broad." R. 16, 11659. (Only the last would give all three deductions in dispute to the Colliers.) This was helpful to a lay jury: intricate arrangements and technical tax jargon were illuminated by his experience with FDIC-bank agreements and knowledge of industry custom, tax law, and authorities in the field. Mr. Knutson never told the jury what legal standards applied or which interpretation was correct as a matter of law, but specifically disclaimed any attempt to interpret the contract for the jury: "You need to bring to bear your own sort of reasons and based upon all of the testimony that you have here as to how broad or how narrow you want to interpret this phrase." R. 16, 11687. He did testify that, in his opinion, it was "reasonable to conclude" that the agreement was drafted in a "very broad manner," R. 16, 11682, a conclusion touching the heart of this dispute, but expert opinion is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Fed. R. Evid. 704(a). To justify exclusion we require something more peremptory. Mr. Knutson set out his views in detail sufficient to allow acceptance or rejection by the jury.

IBC calls him the "worst type of shill," because he "developed litigation theories for the Colliers" then testified as an "unbiased expert on them." Aplt Br. 54. But a shill is a decoy hired to sell something while hiding his affiliations. Oxford English Dictionary (2d ed. 1989 & online version 2011). Mr. Knutson believed what he said. He also testified that he consulted but did not concoct

legal theories, draft complaints, depose witnesses, or participate in any other litigation activity. IBC's authority is inapposite. In <u>United States v. Tran Trong Cuong</u>, 18 F.3d 1132, 1143-44 (4th Cir. 1994), an expert relied on the report of another expert who prepared it for the prosecution; Mr. Knutson wrote his own report. This was also Mr. Knutson's first appearance as an expert witness, yet IBC points us to <u>National Bank of Commerce v. Dow Chemical Co.</u>, 965 F.Supp. 1490 (E.D. Ark. 1996), which excluded a professional "advocate" whose "litigation animus" was revealed in her participation in some 8,000 cases. <u>Id.</u> at 15163-1515. IBC is correct that this court often has reviewed admission of attorney-experts. <u>Zuchel v. City and County of Denver, Colo.</u>, 997 F.2d 730, 742 (10th Cir. 1993) (expert witness is less objectionable when his expertise is in police tactics, not constitutional law). But this doesn't exclude attorneys. In <u>United States v. Arutunoff</u>, 1 F.3d 1112 (10th Cir. 1993), a securities-law professor permissibly testified about "several aspects of securities law," including the meaning of statutory terms; but he "did not attempt to apply the law to the facts of the case or otherwise tell the jury how the case should be decided." <u>Id.</u> at 1118. The district court here did not abuse its discretion in permitting Mr. Knutson to testify.

As for IBC's argument that the contract must be construed against the Colliers, we find that in Oklahoma the rule of contra proferentem applies only as a matter of last resort, once the other common-law principles of construction

(which Oklahoma at any rate has codified) are applied. Okla. Stat. tit. 15, § 170 ("In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."); Dismuke v. Cseh, 830 P.2d 188, 190 (Okla. 1992). In any event, the jury was instructed that if it could not "decide the intention of the parties" then it could "interpret the unclear terms in the contract most strongly against the party responsible for the uncertainty." Instruction No. 20, R. 5, 5531. The jury's decision has substantial support in the record; we sustain its verdict on this issue.

C.    Did the trial court err in denying IBC judgment as a matter of law on the attorney's fee deduction?

IBC claims the Colliers never paid attorney's fees in the FDIC suit, nor did the FDIC seek fees in its counterclaim; but instead that the fees were paid from the Local-owned escrow account. The Colliers respond that because the escrow account was created with Collier money (from proceeds received from their sale of Local) and because they remained liable for all attorney's fees, they are entitled to tax benefits derived therefrom. On appeal IBC must show that all of the evidence, viewed in the light most favorable to the Colliers, reveals no legally sufficient evidentiary basis to find for them. Burrell v. Armijo, 603 F.3d 825, 832 (10th Cir. 2010). We find substantial evidence to establish that the Colliers are entitled to this deduction. The Colliers may not in every instance have paid the

lawyers challenging the FDIC directly, but those payments issued from an escrow account created of their money.  Even after the 2002 RMA, the Colliers paid invoices for attorney's fees sent by Local.  R. 15, 10882-83 (testimony of Joseph Perkovich).

D.     Did Judge Steele's opinion cause unfair prejudice to IBC?

In June 2007, the Colliers sued Arnold & Porter, the attorneys in the FDIC suit, in federal district court in Florida alleging malpractice and conspiracy to commit fraud.  Early in the proceedings Arnold & Porter filed a Rule 12(f) motion to strike allegations from the pleadings, claiming they were based on privileged information that the Colliers received from Ms. Carver.  In May 2009, the trial judge (Judge Steele) denied the motion, ruling that the Colliers violated neither ethical rules nor Local's attorney-client privilege in receiving Ms. Carver's revelations.  MCC Management of Naples, Inc. v. Arnold & Porter, LLP, Nos. 07-cv-387, 07-cv-420, 2009 WL 1514423 at *25 (M.D. Fla. 2009).  The use of that order in this case was fiercely contested.  IBC filed motions in limine to exclude any reference to it.  The district court decided to permit witnesses and counsel to reference the opinion but to disallow them from quoting it or introducing it into evidence.  (IBC accepted the "language" of the instruction but did not believe it "cure[d] the error."  R. 15, 10796.)  IBC claims that judicial opinions are uncommonly prejudicial under Rule 403; that reference to the order forced them

to dispute the findings of a federal judge on the very facts at bar; that it was impossible to explain to a jury that a Rule 12(f) motion concerns only the pleadings' permissibility, not their merit; and that the order was hearsay.

Both parties rely on Johnson v. Colt Industries Operating Corp., 797 F.2d 1530 (10th Cir. 1986). In that case, a products-liability suit against a gunmaker, the plaintiff introduced a Missouri state-court decision to show that a Colt executive knew that a dropped pistol could discharge. We held that the Missouri opinion was improperly admitted as substantive evidence, since judicial opinions present "obvious dangers":

> The most significant possible problem posed by the admission of a judicial opinion is that the jury might be confused as to the proper weight to give such evidence. It is possible that a jury might be confused into believing that the opinion's findings are somehow binding in the case at bar. Put most extremely, the jury might assume that the opinion is entitled to as much weight as the trial court's instructions since both emanate from courts.

Id. at 1534. We cautioned that a court decision should be admitted as substantive evidence "only in the rarest of cases when no other form of evidence is available and then only with detailed limiting instructions." Id. Instead, the "typical and preferable method of introducing such evidence is through the testimony of one familiar with the similar accident or the subsequent litigation." Id. at 1534 n. 4. (Still, the error was harmless, as the evidence against Colt was overwhelming.) By contrast, in United States v. Zimmerman, 943 F.2d 1204 (10th Cir. 1991), this

court reversed the conviction of a lawyer after the district court allowed into evidence statements by two bankruptcy judges essentially accusing him of conspiring to hide money. The district court found them admissible under Rule 404, to show notice, but the circuit saw nothing less than judicial conclusions of guilt as to the crime being tried. Id. at 1211.

The guiding principle, then, in admitting what we might call "judicial" evidence is that, notwithstanding its special potency, it must be treated like any other evidence. There is no bright-line rule against its admission. In evaluating whether the district court's Rule 403 balancing was an abuse of discretion, we might consider: How aggressive was the use of the prejudicial evidence? Were other means available to establish the claim or defense? What exactly *was* the judicial finding? Was it a factual finding? Above all, the question is: did the judicial representation prevent the jury from making its own, and perhaps different, finding?

It is clear from the record that the Florida order was used by the Colliers and Ms. Carver to undermine IBC's allegation that she breached confidentiality agreements with Local and interfered tortiously with Collier-Local arrangements. Three witnesses for plaintiff were examined about the Florida order. According to the first, Mr. Perkovich, "[t]he judge told us that the Colliers were entitled to all information about the FDIC case and that the information about these tax

deductions was not confidential as to the Colliers."[1]   R. 15, 10913; see also

11111.  Ms. Carver said that "Judge Steele issued an order out of that court that

said that I didn't do anything wrong, that the information wasn't privileged or

confidential as to the Colliers."[2]  R. 16, 11467-68.  Prof. Tom Morgan, an expert

witness for the Colliers, testified that the judge "said there was nothing wrong,

the information was not confidential with respect to the Colliers, it was not a

violation of the attorney-client privilege, it was not a violation of any duty of

confidentiality."[3]  R. 17, 11785-86.  Clearly it was probative for the plaintiffs

(involving, as it did, the same people and facts) and potentially prejudicial to the

defendant.

This is a close question.  We have reviewed the record provided as a whole

and conclude that the use of the order, as permitted by the district court, was not

an abuse of discretion.  Precedents in which use of judicial opinions, remarks, or

findings constituted reversible error involved statements far more redolent of

---

[1] The question from Colliers' counsel was: "What, if anything, did Judge Steele, in the Florida case, say concerning the issues that were presented to him?" R. 15, 10912-13.  Carver's counsel later asked: "The Court's ruling was, just in summary, after hearing her testimony, it was what?"  Id. at 11111.  Perkovich responded: "It was that the information pertaining to the tax deductions were not—the information was not confidential as to the Colliers and we were entitled to get that information from Kristy, or the bank."  Id.

[2] The question from Carver's counsel was: "What order was issued out of the Florida Court on May 29, 2009?"  R. 16, 11467.

[3] The question from the Colliers' counsel was: "What did the judge rule?" R. 17, 11785.

strong opinion, far more conclusory, and far more aggressively used. First, the Colliers and Carver only *referenced* the opinion, through the testimony of those present at the Florida hearing. The order itself was never admitted, which is the crucial distinction from Johnson. We realize that parties could seek to introduce prejudicial information by other means. For instance, in United States v. Sine, 493 F.3d 1021 (9th Cir. 2007), a prosecutor seeking to prove mail fraud was disallowed from proffering the remarks of a federal judge, made in another proceeding, that disparaged the defendant's character ("chicanery, mendacity, deceit, and pretense"). Yet he evaded the restriction by asking some 200 questions about it. Id. at 1028. That did not happen here. On direct examination, Ms. Carver, over the course of a day-long examination, was asked fourteen questions about the Florida order. R. 15, 11110-12, R. 16, 11467. Mr. Perkovich, also on direct examination, over some 200 transcript pages, was asked twenty. R. 15, 10911. Prof. Morgan was asked fifteen. R. 17, 11784-87; 11842-43. IBC cross-examined these witnesses and repeatedly emphasized the order's preliminary nature, see, e.g., R. 16, 11480-81, and the fact that only the conduct of the Colliers, not Ms. Carver, was directly at issue in Florida. Nor did the blameworthiness of Ms. Carver turn merely on Judge Steele's findings. IBC was able to suggest through witnesses and cross-examination that, among other things, Ms. Carver violated confidentiality agreements, R. 16, 11403-05; that she had mercenary motives in contacting the Colliers, R. 16, 11412; that she left Local in

anger, R. 16, 11398-400; and that accounting practices mandate confidentiality, R. 16, 11441.

Second, the Colliers and Ms. Carver used the opinion defensively, to rebut an accusation of fraud. The district court was within its discretion in deciding that a party, faced with allegations of tortious or malicious conduct, should not be disabled from inquiring about highly probative evidence. IBC not only alleged various torts but sought indemnity from Ms. Carver, meaning that IBC was potentially seeking some $16 million from an individual. See Answer, Counterclaim, and Third-Party Complaint of Defendants International Bancshares Corporation, No. 06-cv-1345-M, Doc. 48.

Third, the ruling merely denied a motion to strike information from the pleadings in the Florida suit. Unlike the judicial remarks in Zimmerman, it cast no aspersions in any direction. It was a comprehensive 14,000-word opinion that followed three days of testimony.

Fourth, the court read a jointly prepared limiting instruction when the Florida order first arose at trial and, later, in its jury instructions.[4] We find that

---

[4] The instruction during the trial was as follows:

> Pertaining to the Florida litigation, you have heard or will hear testimony and argument about a lawsuit by the Colliers against the law firm of Arnold and Porter, including an order issued by Judge Steele, the judge in the Florida case. You are instructed that you are the ultimate finders of fact and the credibility of witnesses in this case. I have already ruled in this case that Judge Steele's opinion is not binding on this Court. His

the district court struck a permissible balance between the Colliers' right to probative evidence and IBC's right to a fair trial. The fact that we might have struck the balance in a different fashion is not the inquiry under an abuse-of-discretion standard of review. We cannot say that the concern of Johnson—that a jury might accept the Florida order as settling disputed facts in place of making its own independent finding—was realized here.

IBC is right that judicial declarations are hearsay. Herrick v. Garvey, 298 F.3d 1184, 1191 (10th Cir. 2002). It claims the Florida order was "used exclusively for the truth" of proving Local's duty to disclose and the propriety of the Carver-Collier collaboration. Aplt. Br. 61. The Colliers argue that the order was only offered for the non-hearsay purpose of "rebut[ting]" IBC's claim that Carver and the Colliers acted in a "malicious" manner. Carver Br. 32.

Even if the order was hearsay, to overturn the jury verdict we must find that the error affected the substantial rights of IBC. Fed.R.Civ.P. 61; Beacham v. Lee-Norse, 714 F.2d 1010, 1014 (10th Cir. 1983). Wrongly admitted evidence is fatally prejudicial only if "it can be reasonably concluded that with or without such evidence, there would have been a contrary result." Sanjuan v. IBP, Inc.,

---

opinion also is not binding on you. You may give it the weight and significance, if any, you find it deserves. Further, you are bound to apply the law as I instruct you at the end of this case, regardless of any rulings made by Judge Steele in the Florida case.

R. 15, 10979-80.

- 19 -

160 F.3d 1291, 1296 (10th Cir. 1998) (internal quotation marks omitted). We think any error would have been harmless. The Florida order supported Ms. Carver's contention that she and the Colliers acted properly, but it is by no means the *only* such evidence. The order harmonized with Ms. Carver's claim that she acted properly, but she gave a personal account of her conduct. It was consistent with Mr. Perkovich's belief that the Colliers were entitled to her information, but he had an independent understanding of why this was so, based on his dealings with Local. It reflected Prof. Morgan's opinion, but he detailed his own view separately, drawing on his expertise. There was substantial evidence that Local acted culpably and that the Colliers were contractually entitled to the information IBC claims was confidential. The prejudicial effect was mitigated by IBC's persistent cross-examination emphasizing the limits of the opinion and by testimony from Local witnesses suggesting Ms. Carver's blameworthiness. As noted, we cannot say that the persuasive force of the Florida order settled a fact *for* the jury without its independent judgment. We reject Ms. Carver's contention, however, that by seeking attorney's fees for time spent reviewing the Florida order IBC "injected" the order into the case; her need to defend against a claim of fees hardly requires introducing the substance of the order.

E.    Is IBC entitled to judgment as a matter of law on the Colliers' tort and punitive damages claims?

IBC claims that it was error to permit the jury to award tort and punitive

damages in a contract case without a showing of wrongful conduct independent of the breach. They assert that they believed in good faith that the Colliers (1) were never entitled to the Excess Basis Deduction and (2) released their claims to the principal-payment deduction—the same good-faith beliefs, they observe, that allowed the jury ultimately to find for the Colliers. They also claim that the Colliers could have discovered the facts allegedly withheld through reasonable diligence and the imputed knowledge of Arnold & Porter. They seek judgment as a matter of law on the fraud, non-disclosure, constructive fraud, and negligent misrepresentation claims. Finally, they deny any fiduciary relationship existed, since everything was done at arm's length and the Colliers had counsel, and therefore claim the finding of fiduciary breach of duty requires a new trial.

In Oklahoma, damages for fraud, including punitive damages, may be awarded in contract cases, so long as the breach amounts to an "independent, willful tort." Z.D. Howard Co. v. Cartwright, 537 P.2d 345, 347 (Okla. 1975). We are persuaded that there was clear and convincing evidence upon which the Colliers could prove fraud. Testimonial and documentary evidence supports a finding that IBC received some $15 million in tax benefits, and concealed it, despite contractual obligations to the contrary. See, e.g., Perkovich testimony, R. 15, 10904 ("I was upset.... [B]asically they pocketed this and have been holding it for years and hiding it from us"); Carver testimony, R. 16, 11242 (reporting that Local's CEO told her that "I don't want you working on anything that is going to

- 21 -

benefit [the Colliers]").  Tom Dwyer, then an Arnold & Porter lawyer working on the FDIC claims, testified for Local that the company's CEO "made it clear to me I wasn't to disclose [Local's deductions to the Colliers]."  R. 18, 12344.  There was testimony that Local's amended tax return was worded with a vagueness suggestive of concealment.  Ms. Carver, who helped draft the disclosure, testified that it was "intentionally non-descriptive to prohibit the IRS, the FDIC, and the Colliers from knowing what was happening."  R. 16, 11278; see also R. 16, 11256.  The jury was entitled to find fraudulent misrepresentation in the decision of Local's CFO to keep silent about the deductions to Colliers and instructing Ms. Carver and Mr. Dwyer to say nothing to the Colliers unless asked.  Finally, it bears mention that tortious wrongdoing was alleged on *both* sides in this dispute.

IBC is correct that the Oklahoma Supreme Court has held that "[a]ctionable fraud consists of a false material representation made as a positive assertion which is known either to be false, or made recklessly without knowledge of the truth, with the intention that it be acted upon, and which is relied upon by a party to his/her detriment."  Tice v. Tice, 672 P.2d 1168, 1171 (Okla. 1983).  But upon a review of the record, we think a jury could have found that the fraudulent assertion *was* the tax disclosure drafted to prevent inquiry into the material facts and hinder the Colliers from discovering the deductions.

The record also supports the jury's determination that Local was a fiduciary of the Colliers.  Local controlled the books, documents, records, and assets.

Local prepared the tax returns. The Colliers had no representatives at the bank. In Oklahoma, fiduciary relationships can "arise anytime the facts and circumstances surrounding a relationship would allow a reasonably prudent person to repose confidence in another person." Combs v. Shelter Mut. Ins., 551 F.3d 991, 1000 (10th Cir. 2008) (internal quotation marks omitted). The Colliers had no choice but to rely on Local. See R. 15, 10836-39 (testimony of Joseph Perkovich). This factual predicate can also constitute the "special relationship" necessary to a finding of a violation of the duty of good faith and fair dealing. Combs, 551 F.3d at 999. Finally, it is not true that Arnold & Porter's knowledge must be imputed to the Colliers, if the firm was then acting adversely to the Colliers' interests. U.S. Fid. & Guar. Co. v. State of Okla. ex rel. Sebring, 383 F.2d 417, 419 (10th Cir. 1967). The Colliers believed (correctly or not) that the Arnold & Porter lawyers were *their* lawyers, yet it is apparent that the firm was taking direction from Local. See R. 18, 12343-44 (testimony of Tom Dwyer).

IBC seems to contend that it is contradictory to hold that IBC (1) interpreted the contract in good faith yet (2) intended to deceive. We fail to see, however, why a jury could not conclude that Local had a good-faith *opinion* that it was entitled to the tax-deduction benefits, but was nonetheless bound frankly to disclose them and not (as the jury found) conceal their receipt in opaque half-disclosures. Because the jury's findings are not against the weight of the evidence, IBC cannot show that it is entitled to a new trial or judgment as a

- 23 -

matter of law.

F.      Does the admission of the ethics expert's testimony require a new trial?

IBC claims that Professor Thomas Morgan, who testified about Carver's ethical duties, merely testified about legal standards and served as a medium to import Judge Steele's order.  Rulings on the admission of expert testimony are reviewed for abuse of discretion.  James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1212 (10th Cir. 2011).

We see no abuse of discretion.  Prof. Morgan, a nationally recognized expert on ethics, helped the jury understand ethics rules, the tort of champerty and improper payments, the contours of attorney-client privilege, and aspects of confidentiality that may have bound Ms. Carver.  (He believed it a "real stretch" to say that her confidentiality agreements barred her from communicating with the Colliers, R. 17, 11783).  He gave his opinion that the Colliers "did exactly what they should have done" in receiving information from a woman they had worked with reliably for years.  R. 17, 11773-74; R. 17, 11775-77.   His testimony was solidly based in his expertise and his review of depositions, filings, and other documents.[5] Most importantly, since he was retained in the Florida suit, and submitted an affidavit expressing views identical to those here,  R. 17, 11786-87, we can be sure his opinion was not formed upon the Florida order.  Even if he

---

[5]  The district court only permitted him to proffer into evidence that he considered the Florida litigation in his expert report and in forming his opinion in this case.

had not been involved in that case, that order is the type of material on which an expert in Prof. Morgan's field can reasonably rely in forming his views—as IBC's own ethics expert did.  R. 19, 12994-95.

G.      Was the KPMG document inadmissible double hearsay?

IBC claims it was error to admit a memo produced by KPMG, IBC's external auditor, that contained handwritten comments like "Collier [sic] may have claim," "What are obligation[s] do [sic] we have to tell Collier," and "Have we studied tax sharing agreements with Collier [sic]."  R. 12, 9110-13.  The district court admitted the memo, over IBC's objection, under the business-records exception to the hearsay rule, or, alternatively, as the statement of a party-opponent.  IBC claims there was no evidence that KPMG created the memo; that it was that company's regular practice to create such memos; that the handwriting was KPMG's; or that the handwriting, if KPMG's, was added in the ordinary course of business.  We review the ruling for abuse of discretion.  United States v. Blechman, 657 F.3d 1052, 1063 (10th Cir. 2011).

Federal Rule of Evidence 803(6) allows records of regularly conducted activity to be admitted for their truth, even though hearsay, since they are presumed to be inherently reliable.  Though she did not type the document, the typed portion of the document apparently was created by Kristy Carver, not KPMG.  R. 16, 11454-57; R. 5, 5289.  The nature of KPMG's engagement and the circumstances under which the handwritten notes were created are unclear and we

- 25 -

doubt the report is a regularly created business record—they do not appear to be the product of any system, but rather the impressions of an anonymous author. See Trustees of the Chicago Plastering Instit. Pension Tr. v. Cork Plastering Co., 570 F.3d 890, 901 (7th Cir. 2009) (audit report not part of routinely conducted audit probably would not qualify as a business record). Tom Travis, Local's CEO, testified that, as to the source of the handwriting, "[w]e assume it is KPMG, somebody in their diligence work area." R. 20, 13286. He continued: "These are notes, these are like when you are listening to things and you write things in the margin, you know, you are trying to put things on a piece of paper to understand." R. 20, 13286. He seemed to suggest that these were notes made by KPMG, during a 2004 meeting, recording the remarks of Local officers and attorneys (hence the "we"). The Colliers and Carver do not dispute this. See Carver Br. 34. The handwriting, therefore, was not likely made by one under a business duty to report to KPMG, the fact that presumptively guarantees the reliability of evidence admitted under this exception. Nonetheless, information provided by an outsider can become a business record if it is shown that (1) the business has a policy of verifying the information provided to it, or (2) the business possesses a "sufficient self-interest in the accuracy of the record to justify an inference of trustworthiness." Blechman, 657 F.3d at 1066 (citations omitted). Here, however, no foundation supports such an inference. R.16, 11454-55. KPMG no doubt has an interest in providing sound services to its client, but the handwriting

merely notes what an unidentified speaker is saying.  See Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1259 (9th Cir. 1984) (audit reports based upon inadmissible hearsay were not admissible as summaries).  We do not know whether KPMG relied on the memo, verified it, or just discarded it.  United States v. Carranco, 551 F.2d 1197, 1200 (10th Cir. 1977), held that handwritten notations on a freight bill—made by another company—can constitute a business record if relied upon in the regular course of business.  But, again, here it was not shown that KPMG generally relies on the verbal representations of its clients.  Nor do we believe the statement-of-a-party-opponent exclusion applies, since KPMG made the statements, not Local, and nothing in the record suggests that KPMG, hired to provide services to Local, could be construed as Local's "agent or employee."  Fed. R. Evid. 801(d)(2)(D).  We find that it was error to admit this document.

Wrongly admitted evidence constitutes reversible error only if "it can be reasonably concluded that with or without such evidence, there would have been a contrary result."  Sanjuan, 160 F.3d at 1296.  We do not believe a contrary result could have obtained had this memo been excluded: by IBC's admission, the handwriting reflects what was said by officers of Local, most likely Ms. Carver, all of which was otherwise exhaustively explored at trial.  We will not order a new trial or declare judgment for IBC as a matter of law on this basis.

H.    Did the district court err in awarding the Colliers prejudgment interest on

the principal payment and Excess Basis deductions?

An Oklahoma statute allows an award of prejudgment interest to a prevailing party on "damages certain," Okla. Stat. tit. 23, § 6, meaning damages that are "liquidated or capable of ascertainment before judgment," Taylor v. State Farm Fire & Cas. Co., 981 P.2d 1253, 1261 (Okla. 1999). This court will reverse a district court's finding that damages were certain (or not) only if clearly erroneous. Strickland Tower Maint., Inc. v. AT&T Commc'ns, Inc., 128 F.3d 1422, 1429 (10th Cir. 1997).

IBC cites Transpower Constructors v. Grand River Dam Authority, 905 F.2d 1413, 1422 (10th Cir. 1990), for the proposition that, under Oklahoma law, if a trial is necessary to determine damages, then, by definition, the damages cannot be "certain." But in that case the plaintiff only got about 60% of what it claimed; the court ruled that if Transpower's damages were capable of being made "certain" before trial, the jury's award would not have "differed from Transpower's total claim *by such a significant amount*." Id. (emphasis added). Here, by contrast, the Colliers initially sought "compensatory damages exceeding $16,470,122," see Consolidated Amended Complaint, 23, No. 06-civ-1345-M, Doc. 33 (filed Aug. 20, 2007), and recovered $17,223,312, see Order, 2, No. 06-civ-1345-M, Doc. 430 (filed Nov. 16, 2010). In Chesapeake Operating, Inc. v. Valence Operating Co., 193 F.3d 1153, 1156 (10th Cir. 1999), this court held that, under Oklahoma law, "if the fact-finder must weigh conflicting evidence in order

- 28 -

to determine the precise amount of damages due to the plaintiff, then a court cannot grant prejudgment interest."  Id.  The claim in that case was "certain" because the parties, though contesting the fact of liability, stipulated to the amount.  Here, too, the parties agree that the amount at issue is the sum of the tax benefits; this dispute is over the *fact* of liability.  Tort and punitive damages were both part of the judgment, but the jury filled out a verdict form, at IBC's urging, that split damages into components.[6]  This allowed the district court to award prejudgment interest only on the principal payment and Excess Basis deductions.  We do not find that the district court's finding that damages were certain was clearly erroneous.

AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge

---

[6]  The district court entered judgment on the jury's verdict against IBC for actual and punitive damages in the amount of $17,223,312.00, consisting of $7,017,237.00 in actual damages for the principal payment deduction, $7,136,201.00 in actual damages for the excess basis deduction, $140,482.00 in actual damages for the attorney's fee deduction, $1,500,000.00 in actual damages for amounts withheld in escrow, and $1,429,392.00 in punitive damages.